Argued and submitted October 12, 2012, affirmed on appeal and cross-appeal
June 4, petition for review denied October 2, 2014 (356 Or 397)

AMERIVEST FINANCIAL, LLC,
*Plaintiff-Appellant
Cross-Respondent,*

*v.*

Lewis P. MALOUF;
and Charles Financial, LLP,
*Defendants,*

*and*

Daniel Dirk CODDINGTON;
Golden Summit Investors Group, LTD;
Michael Scott Mooney; and
Fountainhead Funding Corporation,
*Defendants-Respondents,*

*and*

PACIFIC NORTHWEST TITLE
AND ESCROW COMPANY;
Robert Taurosa;
Ideal Settlements;
and Michael A. Amato,
*Defendants-Respondents
Cross-Appellants.*

Multnomah County Circuit Court
080201987; A144457

328 P3d 739

Peter Hawkes argued the cause for appellant-cross-respondent. On the briefs were Thomas W. Sondag and Lane Powell PC.

Timothy R. Volpert argued the cause for respondent-cross-appellant Pacific Northwest Title and Escrow Company. With him on the answering-cross-opening brief was Davis Wright Tremaine LLP. On the joint reply brief on cross-appeal were Timothy R. Volpert and Davis Wright Tremaine LLP, and Wendy M. Margolis and Cosgrave Vergeer Kester LLP.

Thomas W. Brown argued the cause for respondents-cross-appellants Robert Taurosa, Ideal Settlements, and Michael A. Amato. With him on the answering-cross-opening brief were Wendy M. Margolis and Cosgrave Vergeer Kester LLP. On the joint reply brief on cross-appeal were Timothy R. Volpert and Davis Wright Tremaine LLP, and Wendy M. Margolis and Cosgrave Vergeer Kester LLP.

Michael Scott Mooney and Daniel Dirk Coddington filed the joint brief *pro se.*

Robert S. Banks Jr., and Banks Law Office, P.C., filed the brief *amicus curiae* for North American Securities Administrators Association, Inc.

No appearance for respondent Golden Summit Investors Group, LTD.

No appearance for respondent Fountainhead Funding Corporation.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Amerivest Financial, LLC, appeals a general judgment for defendants that the court entered after a jury trial. Amerivest assigns error to the trial court's rulings on cross-motions for summary judgment, in which the court concluded that neither an investment program nor individual senior life policy settlements constituted investment contracts and, therefore, were not securities under Oregon law. Amerivest also assigns error to the admission into evidence of a deposition transcript, which allowed the jury to learn of multiple instances in which the managing member of Amerivest invoked his Fifth Amendment privilege against self-incrimination.[1] On review of cross-motions for summary judgment, we consider whether there are any disputed issues of material fact and whether either party is entitled to judgment as a matter of law. *Vision Realty, Inc. v. Kohler*, 214 Or App 220, 222, 164 P3d 330 (2007). For the reasons that follow, we affirm.

Amerivest is a financial-services limited liability company formed under Colorado law and managed at all pertinent times by D. William Thomas.[2] In autumn 2005, Thomas was introduced to Lewis Malouf by a mutual acquaintance. Following their introduction, Malouf and Thomas discussed an investment program involving senior life policy settlements (SLPs), and, in December 2005, Malouf sent Thomas a summary that outlined the terms and procedures of a "managed buy/sell transaction" involving SLPs "based on the use of cash funds in

---

[1] Defendants cross-appeal, assigning error to the trial court's denial of an award of attorney fees to defendants as prevailing parties in the case. We affirm the trial court on that issue without written discussion.

[2] Specifically, Thomas was the sole managing member of Global Marketing Consultants, LLC, an entity that itself was the sole managing member of Amerivest. Thomas also is identified in the record as the "president," "director," and "managing member" of Amerivest. As of the time of this appeal, Thomas no longer has any role in the management of Amerivest, which now exists solely for the purpose of this litigation.

the minimum amount" of $10 million.[3] (Capitalization altered.)[4]

As to the terms, the summary described a "transaction" in which Amerivest would deposit $10 million into an escrow account. Subsequently, Malouf would "issue and exit" SLPs to "exit buyers." Before each "exit," the exit buyer's funds would be deposited in the escrow account, "assuring that the exit buyer [was] fully in place and contracted." According to the summary, Amerivest would earn 11 percent of the total cash funds in the escrow account as net profits with each "tranche"—that is, each group of SLPs bought and sold. Malouf was to conduct 200 "tranches" per year, and, based on those figures, the summary estimated a $220 million net profit for Amerivest over the course of one year, assuming that Amerivest's earnings did not compound. Malouf was to retain any remaining profits, less one percent paid to brokers.

As to the procedures, the summary provided the following: Amerivest would issue a corporate resolution, authorizing Malouf to conduct the transaction, disperse Amerivest's funds, and act as a signatory for Amerivest, as well as issue a "trading authority document" that would give Malouf the authority to "transact the actual buy/sell." At the same time, Malouf and Amerivest would enter into a "Cooperation and Profit Allocation Agreement," finalizing the terms of the arrangement. Malouf would then "cause the escrow company" to issue a letter identifying itself and acknowledging the agreement between the parties and the amount of funds to be used in the transaction.

---

[3] An SLP is a life insurance policy that is sold by the original policy holder to a third party at a price less than the policy's net death-benefit value but greater than the cash value, if any, that the policy holder would receive if the policy were surrendered. The purchaser of an SLP pays any accruing insurance premiums and collects the policy's face value on the death of the insured. For a comprehensive discussion of SLPs, the life-settlement market, and their historical development, see Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U Pa J Bus L 173 (2010).

[4] Many of the documents underlying this appeal are written entirely in capital letters. For ease of reading, we have altered the capitalization in the portions of those documents that we reproduce in our opinion.

Malouf had been laying the foundation for transactions of the type that he proposed to Amerivest since at least September 2004. At that time, Malouf, doing business as Charles Financial LLP,[5] entered into a "Financial Instrument Purchase Agreement" with Golden Summit Investors Group Limited, acting through its chairman, Daniel Coddington. Under that agreement, Golden Summit would sell Charles Financial an unspecified number of SLPs "as required to comply with each tranche." The agreement defined the parameters for the insurance policies underlying the SLPs, including age and life-expectancy requirements for the insureds. The agreement also specified that each sale would close in an escrow account to be designated by Golden Summit. In a subsequent letter, Malouf emphasized the importance of the last point, explaining that "if [the] buy/sell transaction [was] going to be a viable option for both [their] clients and [themselves]," then "the escrow company must be a true, neutral third-party." Malouf indicated that the existence and reputation of an escrow company in any transaction was essential to make prospective clients "comfortable" in their dealings with him.

In December 2005, as Malouf entered discussions with Amerivest, Coddington began the process of assembling SLPs to satisfy Golden Summit's obligations under its agreement with Charles Financial. For help locating SLPs that fit within Malouf's parameters, Coddington contacted M. Scott Mooney. Coddington knew that Mooney—who owned a financial-services and real-estate-development company, Fountainhead Funding Corporation—had some experience working with SLPs. Mooney, in turn, contacted Ideal Settlements, a company with which Mooney had worked in the past that was owned by Robert Taurosa and in the business of buying and selling SLPs. Mooney inquired whether Ideal had any policies that would fit within Malouf's parameters. At the same time, Mooney and Coddington began

---

[5] Despite its designation as a limited liability partnership (LLP), it does not appear that Malouf registered Charles Financial as an LLP in California, where its offices were listed, or in any other jurisdiction. In an affidavit submitted in support of a motion to dismiss, Malouf stated that "[t]he separate legal organization of [Charles Financial] never was completed" and that "'Charles Financial LLP' was essentially a dba for actions [that Malouf] took as an individual."

communicating with Jean Mann, a senior escrow officer at Pacific Northwest Title, seeking to open an escrow account for a purchase of SLPs from Ideal.

Over the next few weeks, Ideal worked to assemble a portfolio of satisfactory SLPs. Initially, Ideal identified seven potential policies and sent a spreadsheet detailing them to Mooney, who sent the spreadsheet to Coddington, who, in turn, sent it to Malouf. Malouf, who was in charge of the ultimate policy selection, had a number of questions regarding the policies and their premiums. Those questions, and other concerns, were relayed to Ideal through Coddington and Mooney, allowing Ideal to alter the portfolio to better meet Malouf's needs. Working back and forth in that manner with Coddington and Mooney serving as intermediaries, Malouf ultimately settled on a portfolio of five SLPs to purchase for the first "tranche" of his transaction with Amerivest.

In January 2006, Malouf, under the auspices of Charles Financial, sent Amerivest a "Cooperation and Profit Allocation Agreement." The agreement, which designated Charles Financial as the "provider" and Amerivest as the "client," generally mirrored and expanded on the terms contained in the initial transaction summary. Under the agreement, after Amerivest deposited its funds into the escrow account, the funds would be "entered into a private, managed, senior life settlement buy/sell agreement," all aspects of which—including the selection of the individual SLPs, the "performance of the buy/sell," and the "exit to provider's exit buyers"—were to be "operated," "manage[d]," and "performed under the direct supervision of provider." In order to facilitate the management of the transaction, and in accordance with the initial transaction summary, the agreement also required Amerivest to "issue a separate corporate resolution appointing provider as an officer and director of client and empowering said appointee with the authority to place the cash funds into buy/sell transactions and disburse the profits according to [the] agreement."

The parties entered into the agreement on January 13, 2006. On the same day, Amerivest issued a corporate

resolution that named Malouf as Amerivest's "Director of Finance and Investments." In that capacity, Amerivest

> "empowered [Malouf] with full signature authority to act on behalf of [Amerivest], in accordance with all applicable U.S. laws and regulations *** for the purpose of protecting [Amerivest's] interests in all financial transactions and investments, as pledged by the corporation to the full control of Mr. Malouf."

In addition, the resolution expressly authorized Malouf to "deploy corporate assets in the amount of [$10 million] *** into a private, managed, buy/sell transaction based on the use of [SLPs]," and "to enter into and sign all documents with the escrow company and fee agreements and to receive and distribute all proceeds of the transaction, all in accordance with the terms of the Cooperation and Profit Allocation Agreement."

Also on the same day, Mann sent a letter to Amerivest, Charles Financial, and Golden Summit, explaining the role of Pacific Northwest Title in the transaction and providing instructions for Amerivest to deposit its $10 million in the escrow account. The letter, which Mann had received from Coddington and sent after making only minor changes, was to be signed by representatives of Amerivest, Charles Financial, and Golden Summit. After all parties had signed the letter, Amerivest wired $10 million to the designated escrow account on January 17, 2006.

A complicated series of escrow transactions followed, the details of which, for purposes of this appeal, are largely unimportant. By the end of January, Amerivest had purchased from Ideal for approximately $6.5 million the five SLPs that Malouf had selected. Golden Summit and Charles Financial each received approximately $1.5 million in "proceeds" from the sale, Mooney received a three percent commission on the sale, and Pacific Northwest Title received approximately $30,000 in fees. In total, the underlying insurance policies had a face value of $23.25 million. Amerivest's involvement in the transactions was handled entirely by Malouf.

In early February 2006, Amerivest began receiving premium notifications for the policies that it had obtained in the transaction. On receipt of one of the notifications, Victor Larson, an officer and the "Managing Secretary" of Amerivest, called Mann to determine the status of Amerivest's $10 million and indicated that he did not believe that the transaction had been handled properly. According to Larson, Malouf lacked authority to authorize any disbursement of Amerivest's funds unless an exit buyer of the SLPs was in place with funds on deposit in the escrow account. In the face of that information, Mann told Larson that Pacific Northwest Title would not handle any further transactions for Amerivest absent additional, written confirmation that Malouf had the authority to act on Amerivest's behalf.

Shortly thereafter, Amerivest sent a letter to Pacific Northwest Title that confirmed Malouf's authority to act for Amerivest. The letter, which was written by Thomas and signed by Larson, apologized for the confusion and indicated that Larson did not intend to "cast any dispersion [*sic*] on the transaction; to cast any dispersion [*sic*] on our duly appointed Director of Finance and Investments, Mr. Lewis P. Malouf; nor to cause you * * * any concerns from our point of view." The letter reaffirmed that "Malouf is [Amerivest's] legally appointed and empowered Director of Finance and Investments with full authority to act upon this transaction," that the corporate resolution empowering Malouf to act for Amerivest "stands with full force and without any further restrictions," and that "it is Mr. Malouf and Mr. Malouf alone that [*sic*] is the empowered person to act on behalf of our corporation with regards to this Escrow Transaction and that there are no requirements for any other member of this corporation to view, approve or sign any of the documents associated [with the transaction]."

Thomas and Larson continued working with Malouf throughout early 2006 to sell the five SLPs to exit buyers. During that time, Malouf continually reassured Thomas and Larson that a sale was imminent; Larson and Thomas, in turn, reassured Amerivest's investors of the same. Ultimately, Amerivest sold one SLP for $2.6 million. The remaining SLPs lapsed after Amerivest failed to pay

the premiums on the underlying insurance policies, rendering them worthless. Thereafter, Amerivest filed this action against Malouf, Charles Financial, Coddington, Golden Summit, Mooney, Fountainhead Funding, Taurosa, Taurosa's attorney, Ideal, and Pacific Northwest Title. The action raised twelve claims for relief, alleging breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, common-law fraud, aiding and abetting common-law fraud, and various violations of Oregon securities law, ORS chapter 59.

A flurry of pretrial motions followed, resulting in the disposal of all but one of Amerivest's claims. First, Malouf successfully moved to dismiss all claims against him—both personally and acting as Charles Financial—based on a forum-selection clause in his agreement with Amerivest. Then, in cross-motions for summary judgment, each remaining defendant sought summary judgment on all claims, and Amerivest, in turn, sought partial summary judgment on its securities claims. Specifically, Amerivest sought to establish that, as a matter of law, the investment program between Amerivest and Charles Financial, as well as each individual SLP purchased in the course of that program, was an investment contract and, thus, a security under Oregon securities law.

In a written order, the trial court granted summary judgment to defendants on Amerivest's breach of contract, common-law fraud, and securities claims. In doing so, the trial court ruled that neither the investment program nor the individual SLPs constituted investment contracts because "each investment was made through the management and control of [Amerivest's] own Malouf, not others." The trial court denied defendants' motions for summary judgment on Amerivest's claim for aiding and abetting Malouf's breach of fiduciary duty, and that claim was tried to a jury, which entered a verdict for defendants. This appeal followed.

On appeal, Amerivest assigns error to the trial court's summary judgment rulings, renewing its argument that the investment program and the individual SLPs purchased under it were investment contracts and, therefore, securities

under Oregon securities law.[6] Accordingly, Amerivest contends that the trial court erred in denying its motion for partial summary judgment on that issue and, concomitantly, that the court erred in granting defendants' motions for summary judgment on it. Specifically, Amerivest argues that the court erred by granting summary judgment to defendants on its twelfth claim for relief, which alleged that each of the defendants had materially aided Malouf in the performance of his securities fraud, in violation of ORS 59.137.[7]

The parties' arguments on appeal center on whether the investment program and the individual SLPs were investment contracts and, thus, securities under Oregon law. Before addressing those arguments, a brief sketch of the operative legal principles is helpful. Oregon securities law defines the term "security" broadly to encompass, among many other things, an "investment contract." ORS 59.015(19)(a). Building on federal case law, Oregon courts have settled on four requirements for an investment contract.[8] Thus, under Oregon law, an investment contract— and therefore a security—exists if there is (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profit; (4) to be made through the management and

---

[6] As noted earlier, Amerivest also assigns error to the trial court's admission of portions of Thomas's deposition transcript into evidence, which allowed the jury to learn that Thomas had repeatedly invoked his Fifth Amendment privilege against self-incrimination. We affirm without written discussion the trial court's ruling on the admissibility of the transcript.

[7] Amerivest alleged violations of Oregon securities law in its seventh through twelfth claims for relief under a variety of theories. On appeal, Amerivest challenges the trial court's grant of summary judgment only on Amerivest's twelfth claim for relief, which alleged that "Coddington, Golden Summit, Amato, Taurosa, Ideal Settlements, Mooney, Fountainhead Funding, and Pacific Northwest Title violated ORS 59.137(1) by materially aiding Malouf in the violation of ORS 59.135." Amerivest does not challenge, and we therefore do not consider, the trial court's entry of summary judgment on Amerivest's seventh through eleventh claims for relief.

[8] The United States Supreme Court established in *SEC v. Howey Co.*, 328 US 293, 298-99, 66 S Ct 1100, 90 L Ed 1244 (1946), the test to be used to determine under federal securities law whether a transaction is an investment contract. Oregon courts have adopted a modified version of that test to determine under Oregon securities law whether an investment contract exists. *See Computer Concepts, Inc. v. Brandt*, 310 Or 706, 714, 714 n 7, 801 P2d 800 (1990) (noting Oregon's modification of the *Howey* test, as well as parallel modification of the test in federal courts).

control of others. *E.g.*, *Computer Concepts, Inc. v. Brandt*, 310 Or 706, 714, 801 P2d 800 (1990); *Pratt v. Kross*, 276 Or 483, 497, 555 P2d 765 (1976).

The resolution of this appeal turns on the fourth element of that formulation. As noted above, the trial court granted summary judgment on Amerivest's securities claims based on its conclusion that "each investment was made through the management and control of [Amerivest's] own Malouf, not others"—and the parties' arguments on appeal are aimed squarely at that conclusion. The underlying facts, as set out above, are undisputed: Malouf had "complete managerial control over the Investment Program and the purchase of SLPs" and, to facilitate that managerial control, Amerivest named Malouf as its officer and Director of Finance and Investments. Defendants argue that those two undisputed facts are dispositive: Amerivest had complete managerial control over the investments, through the actions of its officer, Malouf; thus, it follows, the investments were not made through the management and control of others.

Notwithstanding Malouf's title as Amerivest's Director of Finance and Investments, Amerivest contends that, when read in the context of the underlying agreement between Amerivest and Malouf, the corporate resolution served *"only to grant [Malouf] signing authority* and thus to permit him to carry out the Investment Program transactions over which he alone, as promoter of the Investment Program and *under the auspices of Charles Financial,* had complete managerial control." (Emphasis added.) With his authority so circumscribed, Amerivest contends that Malouf wore two "hats" in the course of the transaction: He wore his "Amerivest 'hat' for the sole purpose of carrying out the ministerial task of signing transaction documents in Amerivest's name," but, "when Malouf carried out managerial functions relating to the Investment Program, such as assembling the SLP portfolios and arranging the transactions with buyers and sellers, he would be wearing his Charles Financial 'hat'"—and therefore not acting on behalf of Amerivest. Given that distinction, and relying on *Pratt*, 276 Or 483, Amerivest argues that "any actions Amerivest took in furtherance of [the investments]—even

when acting 'through' Malouf—were non-managerial, and the Investment Program and the SLPs purchased pursuant to that program remained investment contracts under the managerial control of others." We disagree.

*Pratt* involved an investment by a passive investor in an interest in a limited partnership. The defendant served as the general partner of the company, with full control over its management. *Id.* at 485. The plaintiff was a limited partner and an employee of the partnership, with unspecified duties and no role in its management. *Id.* When the plaintiff brought an action against the defendant under Oregon securities law, the defendant argued that, because the plaintiff was employed by the partnership, her expected profits would, at least nominally, result from her work as an employee of the partnership and not solely from the management efforts of the defendant. *See Howey*, 328 US at 298-99 (defining an investment contract under federal law to require the expectation of profit "solely from the efforts of the promoter or a third party").

The Supreme Court rejected that argument and focused its analysis on whether, *as a practical matter*, the expected profits were, "to be made through the management and control of others." *Pratt*, 276 Or at 497. Given the respective roles of the plaintiff and the defendant in the limited partnership, the court concluded:

> "Because the partnership agreement put management entirely in the hands of defendant, we believe plaintiff's employment by the partnership in a non-management position does not keep the transaction from being an investment contract. An investor who labors without having an opportunity to participate in management is just as helpless to govern what happens to his investment as is a purely passive investor."

*Id.* (internal citations omitted).

Amerivest seeks to cast itself in the role of *Pratt*'s passive investor. And its position is not without merit: As we have noted, the Cooperation and Profit Allocation Agreement gives management and control of the investment program to Malouf, supporting Amerivest's argument that it was merely a passive investor in the investment program.

But unlike the individual plaintiff in *Pratt*, Amerivest—a legal entity—simultaneously granted Malouf the authority to act on its behalf: On the same day that Amerivest entered into the agreement, it named Malouf its Director of Finance and Investments, empowered with full signature authority to act on behalf of Amerivest "for the purpose of protecting [Amerivest's] interests in all financial transactions and investments, as pledged by the corporation to the full control of Mr. Malouf."

We do not believe that that language, or any other portion of the corporate resolution, limits Malouf's authority as Amerivest's Director of Finance and Investments to performing purely ministerial tasks.[9] As an initial matter, the corporate resolution does not describe, as Amerivest now argues, the role of a purely ministerial document signer. As noted above, the resolution empowered Malouf "to act on behalf of [Amerivest] * * * for the purpose of protecting [Amerivest's] interests in all financial transactions

---

[9] The pertinent portions of the resolution relating to Malouf's authority as Amerivest's Director of Finance and Investments provide:

"Now be it resolved that Lewis P. Malouf, a director of this corporation * * * is hereby empowered with full signature authority to act on behalf of this corporation * * * for the purpose of protecting the corporation's interests in all financial transactions and investments, as pledged by the corporation to the full control of Mr. Malouf; and,

"To empower Mr. Malouf to deploy corporate assets in the amount of [$10 million] into a private, managed, buy/sell transaction based on the use of senior life settlement policies; and,

"To empower Mr. Malouf to enter into and sign all documents with the escrow company and fee agreements and to receive and distribute all proceeds of the transaction, all in accordance with the terms of the Cooperation and Profit Allocation Agreement; and,

"These empowerments shall include the authority to enter into and sign agreements for the sole purposes as herein above set forth and to instruct any and all banks, escrow companies, securities houses, providers, etc. with respect to any requirements for settlement of each tranche of each transaction; and,

"The necessary authority and powers required to undertake these tasks and responsibilities are hereby granted to Mr. Malouf; and,

"Be it further resolved that any and all acts authorized pursuant to these resolutions and performed to the passage of these resolutions [*sic*] are hereby ratified and approved and that these resolutions shall remain in full force and effect whereby the official Director of Finance and Investments, Mr. Lewis P. Malouf, shall rely on these resolutions until written notice of their revocation shall have been delivered to and received by Mr. Malouf."

and investments." It went on to grant Malouf the specific authority to deploy Amerivest's corporate assets into the investment program and "to enter into and sign all documents with the escrow company and fee agreements and to receive and distribute all proceeds of the transaction, all in accordance with the terms of the Cooperation and Profit Allocation Agreement," as well as the "necessary authority and powers required" to do so. Properly read, those provisions do not limit Malouf's authority to purely ministerial tasks.

Neither does the Cooperation and Profit Allocation Agreement, when viewed as context for the corporate resolution, create the firewall that Amerivest constructs between Malouf's role as the manager of the investment program and his role as Amerivest's director. Although it sets out in detail the actions Malouf was to take in the course of his management of the underlying transactions, nothing in the agreement forecloses Amerivest from participating in that management—whether through Malouf, acting as Amerivest's Director of Finance and Investments, or otherwise. Leaving aside the corporate resolution, the agreement provided that Malouf was "at all times, [to] keep [Amerivest] fully informed of all aspects of the transactions," suggesting that Amerivest had the opportunity—but no obligation—to participate in the management of the investment program.

Amerivest points to several portions of the corporate resolution in support of its position. First, it emphasizes that Malouf was only granted authority to act on behalf of Amerivest in regards to "all financial transactions and investments, *as pledged by the corporation to the full control of Mr. Malouf.*" (Emphasis added.) Amerivest reasons that, because "[t]he only transactions and investments Amerivest 'pledged * * * to the full control of Mr. Malouf' were the purchases and sales of SLPs pursuant to the Investment Program[,] Malouf's 'full control' of those transactions derived from the *Agreement,* not the corporate resolution." (Emphasis and omission in original.)

As a starting point, we will assume that Amerivest is correct that the emphasized portion of the resolution should be read as a limitation on Malouf's authority as the

Director of Finance and Investments and not otherwise.[10] Accepting that limitation, the effect of the corporate resolution is to grant Malouf "full signature authority to act on behalf of [Amerivest] * * * for the purpose of protecting [Amerivest's] interests in [the investment program.]" But whether Malouf's "full control" over the investment program stemmed from the Cooperation and Profit Allocation Agreement and was reflected in the corporate resolution, or whether his "full control" stemmed from the corporate resolution directly, the result is the same: Amerivest granted Malouf authority to act on its behalf, as its Director of Finance and Investments, with regard to the investment program. Malouf exercised that authority in assembling and purchasing the portfolio of SLPs. It follows that Amerivest, through its Director of Finance and Investments, was not a purely passive investor in the investment program, nor was it engaged in purely ministerial tasks without an opportunity to participate in the management of the program. Therefore, neither the investment program nor the individual SLPs were investment contracts, because they were under the management and control of Amerivest's Director of Finance and Investments, Malouf.[11] *Pratt*, 276 Or at 497.

In sum, because Amerivest clothed Malouf with the authority to act on its behalf with respect to the relevant transactions, the expected profits for Amerivest were

---

[10] For example, while the language "all financial transactions and investments, as pledged by the corporation to the full control of Mr. Malouf" could be understood to limit Malouf's authority to the specific transactions and investments that Amerivest had pledged to his control—specifically the investment program—it could just as easily be understood broadly to announce Malouf's authority to act on behalf of Amerivest in all transactions and investments, which the corporation had pledged to his control.

[11] Accordingly, we need not decide whether SLPs, as a general matter, satisfy the elements of an investment contract. The parties and *amicus* dispute that point at some length, arguing over whether, for purposes of investment-contract analysis, the pre-purchase services of a third party can satisfy the fourth element of the Oregon investment-contract test. *Compare SEC v. Life Partners, Inc.*, 87 F3d 536, 545-48, *reh'g denied*, 102 F3d 587 (DC Cir 1996) (SLPs not investment contracts, because profits depend on the death of the insured, not any post-purchase management and control of others), *with SEC v. Mutual Benefits Corp.*, 408 F3d 737, 744 (11th Cir 2005) (SLPs "amount[ed] to a classic investment contract"). Here, however, we conclude that Malouf's actions—whether pre- or post-purchase—did not constitute the management and control *of others*. Therefore, *these* SLPs were not investment contracts.

to result from the management and control of Amerivest's own officer, and not others. Accordingly, neither the SLPs nor the investment program that was committed to Malouf's full control were investment contracts.

Affirmed on appeal and cross-appeal.