Argued and submitted June 24, affirmed October 26, 1981

BLACK et al,
*Petitioners,*

*v.*

CORPORATION DIVISION,
*Respondent.*

(No. 932, CA 19400)

634 P2d 1383

Jeffrey P. Foote, Portland, argued the cause for petitioner Charles I. Black. On the brief was John J. Haugh, Portland.

Jan Peter Londahl, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Young, Judges.

YOUNG, J.

## YOUNG, J.

Petitioner Black[1] appeals from a final order of the Corporation Commissioner, issued pursuant to ORS 59.305, to cease and desist offering or selling unregistered securities, making untrue statements or omitting statements of material fact in connection with selling securities, and engaging in business that "operates as a fraud * * * in connection with the sale of a security." Petitioner contends that 1) the hearings officer was biased and violated ORS 244.120(1)(d), requiring disclosure of potential conflicts of interest, and thus violated petitioner's due process rights; and 2) the Commissioner exceeded his authority, because the transactions at issue involved commodity futures and not securities and were therefore within the exclusive federal regulatory jurisdiction of the Commodity Futures Trading Commission (CFTC).[2] We affirm.

Beginning about May, 1977, Oxford Investment Management Corporation (Oxford), a Cayman Island corporation acting through petitioner and others, solicited and accepted Oregon investors' funds for a tax-shelter investment scheme involving straddles in Treasury bills and other "commodity" futures. Petitioner managed and otherwise controlled Oxford's assets and supervised Oxford's transactions with its investors. Pursuant to ORS 59.245, the Corporation Commissioner investigated the scheme and issued a Notice of Proposed Order to Cease and Desist for violations of the Oregon Securities Law. A hearing was held in September and October, 1979. The Commissioner reviewed the hearings officer's Findings of Fact and Recommendation and adopted them, with minor exception, in his final order after hearing arguments.

### Hearings Officer's Bias

██ Petitioner argues that the hearings officer was biased and was required to recuse himself. Petitioner claims a due process violation for lack of proper separation

---

[1] Petitioner Bryan's petition was dismissed February 27, 1981; he is no longer party to this appeal.

[2] 7 USC §2, *infra*, n. 6, grants to the CFTC exclusive regulatory jurisdiction over certain transactions but specifically preserves jurisdiction of state and federal courts.

of functions because "the Corporation Commissioner filed the complaint and two of his employes performed the roles of prosecutor and hearings officer." A claim that combining investigatory, prosecutorial and administrative functions in a single agency is unfair must be supported by a showing of actual bias. *Gregg v. Racing Commission,* 38 Or App 19, 25, 588 P2d 1290, *rev den* (1979); *see Coldiron v. Curry County Comm.,* 39 Or App 495, 499, 592 P2d 1053 (1979). Petitioner's particular complaint was the hearings officer's participation in examining witnesses. No prejudice resulted. The hearings officer's questions did not, in form or substance, evidence bias or tend to influence witnesses. Petitioner had the opportunity to, and did, examine and cross-examine witnesses. The hearings officer merely performed his duty to develop a full record for the Commissioner's review and exercised his right to question witnesses, as provided in the then effective administrative rules.[3]

Petitioner has not shown that the hearings officer was personally biased against him. The only documentation of bias is petitioner's affidavit that he had refused to participate in a 1970 investment venture then being formed by the hearings officer, who was not then a Commission employe and who "appeared to be quite perturbed with [petitioner's] decision." The affidavit alleges no more than remote and speculative matters, insufficient to overcome the presumption that "'state administrators [are] men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Grabenhorst v. Real Estate Division,* 43 Or App 287, 292, 602 P2d 1089 (1979), *rev den* (1980) (quoting *United States v. Morgan,* 313 US 409, 421, 61 S Ct 999, 85 L Ed 1429 (1941)). Petitioner has not met his burden to show actual bias.

■　　Petitioner contends that the hearings officer violated ORS 244.120(1)(d). That section requires any appointed official who has a potential conflict of interest to notify

---

[3] "The presiding officer and the affected parties and the agency or its attorneys shall have the right to question or examine or cross-examine any witness." Oregon Administrative Rules, ch 137, § 03-040(3) (effective Nov. 25, 1977), adopted by Corporation Division, OAR 815-01-005 (effective June 10, 1978).

the person appointing him of the conflict and to request that person to dispose of the matter. The hearings officer was subject to, but did not violate, that requirement; the alleged bias was not a "potential conflict of interest," because, as alleged, its effect would not have been "to the private pecuniary benefit or detriment of the [hearings officer] or member of [his] household." ORS 244.020(4).

### "Securities" v. "Commodity Futures" and Jurisdiction

■ The difficult question here is whether the subject transactions were "securities" under ORS 59.015(13)(a),[4] and therefore within state jurisdiction, or "commodity futures" traded on a recognized board of trade and therefore subject to the exclusive federal jurisdiction of the CFTC under 7 USC § 1 *et seq.*

Commodity futures and securities trading are highly technical areas. This case involves a particular tax-avoidance scheme using Treasury bill (T-bill) straddles. These straddles are risky; in the ideal straddle, the investor holds two offsetting T-bill contracts. For simplicity, we can describe them as one money-making or "winning" contract and one money-losing contract. The money made or lost depends on the change in interest rates from the time an investor acquires the contracts until he closes them out. The investor gambles that the rates will change in his favor. (T-bills are sold at a discount from the full face value paid by the Treasury when the bills mature; the discount represents interest.) Ideal T-bill straddles for tax-avoidance purposes would allow the investor to close out his losing contract for ordinary loss before the end of his tax year and to hold the winning contract into the next tax year

---

[4] ORS 59.015(13)(a) reads:

" 'Security' means a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in a pension plan or profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such title or lease, or in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificates for, receipt for guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

before closing it out for long-term capital gain tax treatment. The good news was that most of the loss would be only a paper loss several times greater than the investment cost. It would not be a real loss, because the ideal winning contract gain would offset the losing contract loss. The original investment would be minimal for one straddle: as little as $400 for offsetting T-bill contracts of $1,000,000 each. The bad news was that few straddles would be ideal.

After various other tax-shelter straddles were foreclosed by changes in tax laws, T-bill straddles, along with currency and similar straddles, became the new twist in futures trading. The Internal Revenue Service had not yet ruled on whether T-bill straddle shelters would receive the desired tax treatment. Investment advisors counted on favorable IRS treatment, because unfavorable treatment might discourage investment in the underlying T-bills.

Petitioner's scheme proposed investing investors' capital in T-bill futures and others, such as silver, affording similar tax avoidance. But it was more complicated. Petitioner presumed to act as an investment advisor representing his own corporation, which in turn represented Oxford, incorporated in the Cayman Islands. Petitioner and his corporation were to forward investors' money to Oxford, which would then invest it in T-bill futures. Because Oxford was not a registered trader, it had to invest through a broker registered with the CFTC to trade on recognized futures markets. Oxford was to select and buy T-bill futures straddles to meet the tax needs of particular investors. It was to buy back the losing contracts when investors closed them out and to replace those contracts to continue the straddles; thus, Oxford was to invest its own funds in similar futures to maintain the inventory needed to back the investors.

The Commissioner found the relationship between petitioner and Oxford that was more than just that of an investment advisor forwarding investors' capital to a futures trader. Petitioner contests on appeal only Finding 6,[5]

---

[5] Finding Number 6:

"That the participation interests in this financial program of Oxford described above are investment contracts. That in excess of $900,000 was received by Oxford through the sale of these investment contracts in Oregon."

that the "participation interests" were investment contracts and, therefore, securities under ORS 59.015(13)(a). He argues that the investment scheme is analogous to discretionary commodity futures trading accounts, which some courts have held not to be investment contracts. Oregon regulatory jurisdiction depends on finding that the interests were investment contracts.

The transactions between Oxford and its investors were not merely discretionary commodity futures trading accounts in which investors deposited funds with a trader to invest for them within the trader's discretion, without notice to investors before the transactions and without risk to the trader beyond its commissions. Such were the accounts in *Brodt v. Bache & Co.,* 595 F2d 459 (9th Cir 1978), relied upon by petitioner for the proposition that discretionary accounts are not investment contracts. That case held only that, without more, merely furnishing investment counsel to another for a commission through a discretionary account does not satisfy the "common enterprise" element of the test for investment contracts under *SEC v. Howey Co.,* 328 US 293, 301, 66 S Ct 1100, 1104, 90 L Ed 1244 (1946), and its progeny: "an investment of money in a common enterprise with profits to come solely from the efforts of others."

The investors did leave actual trading to Oxford's discretion; but unlike the discretionary accounts that have been held not to be investment contracts, Oxford's scheme required Oxford to invest its own funds in similar transactions and to purchase from its investors when they closed out their losing contracts. Although Oxford represented that individual investors would have individual accounts for which Oxford would purchase and to which it would then assign particular contracts, Oxford pooled the funds: it opened, in its own name, only one account with a licensed trader. If Oxford used its own funds to purchase contracts for itself, those, too, must have been pooled with investors' funds. The documents show that Oxford invested only a fraction of the investors' funds it received, and the documents do not indicate whose funds they were. The Commissioner found that Oxford used investors' funds to speculate

for its own account and for its own use.[6] This scheme was nothing more than a means to raise capital for Oxford's speculations. It had some features of ventures used to set up commodity pooling arrangements; even the CFTC has acknowledged that

"[of] course, the concept of capital formation [for commodity pools] arises under, and has specific relevance to, securities laws; it is a concept having no necessary relevance to the Commodity Exchange Act or to the proper interpretation of the exclusive jurisdiction provision that Act contains." CFTC Interpretive Letter No. 77-14 Comm. Fut. L. Rep. (CCH) § 20, 486 at 21,975 (Sept. 16, 1977).

Notwithstanding the CFTC's "exclusive jurisdiction with respect to accounts, agreements * * *, and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a [designated] contract market," 7 USC § 2,[7] we conclude, for two reasons,

---

[6] Finding Number 10:

"10. Oxford did not in fact operate this financial program in the matter [sic] which was represented to the investors. Oxford did not engage in futures transactions on recognized exchanges in a matter to offset its risks in contracts which it purportedly sold to and bought from its investors, but rather used its investors' funds for other purposes including unrelated speculations in futures contracts for its own account and providing funds for the use and enjoyment of its controlling person or persons. Oxford did not select contracts for purchase and sale with its investors, but rather delayed taking action on behalf of its investors until sufficient fluctuations in price had taken place so that if some combination of contracts had been entered into with the investor, the investor would have received the desired realized losses and unrealized gains. Oxford then, after the fact, reported to the investor that it had entered into such a successful combination of contracts with and for the investor. The transactions reported to the investors were a sham and unbeknownst to the investors did not represent actual transactions and did not entitle the investors to the deductible losses represented, nor any future offsetting gains."

[7] 7 USC § 2 reads in pertinent part:

"The word 'commodity' shall mean wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles except onions as provided in section 13-1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in: *Provided*, That the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option,' 'privilege' 'indemnity,' 'bid,' 'offer,' 'call,' 'advance guaranty,' or decline guaranty,') and

that state regulatory jurisdiction over this scheme has not been pre-empted. First, we interpret the comma setting off "traded or executed on a [designated] contract market" to mean that that phrase modifies the foregoing "accounts, agreements * * *, and transactions"; the CFTC has exclusive jurisdiction over them *only if* traded or executed on such a market. These were not. Second, we do not interpret "involving" to mean "touching upon in any way."

> "* * * CFTC exclusive jurisdiction was never intended to extend to the capital-raising activities that may precede 'transactions involving contracts of sale of a commodity for future delivery.' Neither in the [Commodity Exchange Act] nor in the legislative history, is there any indication that such functions are within the exclusive or concurrent jurisdiction of the CFTC. Capital-raising functions, moreover, give rise to traditional forms of securities, yet such securities never were intended to be within the purview of the CFTC. * * * It is only after the capital is raised 'either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity,' that CFTC regulatory activities commence. Thus, although the activities of the enterprise itself may be subject to CFTC surveillance and exclusive jurisdiction, SEC jurisdiction continues over the relationship of the enterprise to its investors." (Footnotes omitted.) Guttman, *The Futures Trading Act of 1978: The Reaffirmation of CFTC-SEC Coordinated Jurisdiction over Security/Commodities,* 28 Am. U. L. Rev. 1, 29-30 (1978).[8]

---

transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title: *And provided further,* that, except as hereinabove provided, nothing contained in this section shall (i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any other State, or (ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."

[8] Professor Guttman was concerned with the CFTC's relationship to the Securities and Exchange Commission. We believe the same is true as to its relationship to state securities laws that are not pre-empted by SEC jurisdiction.

Having found these transactions not to be within exclusive CFTC jurisdiction, we must determine whether they are "investment contracts" and, therefore, securities under ORS 59.015(13)(a). There are at least two possible tests. Petitioner argues that the test in *Howey* was not met because profits were not to come solely from others' efforts and because it was not a common enterprise. We find substantial evidence in the record to affirm the Commissioner's finding that they were investment contracts under the *Howey* test and under the alternative risk-capital test approved by the Oregon Supreme Court and urged by respondent.

### Howey-Forman Test

In *United Housing Foundation, Inc. v. Forman,* 421 US 837, 852, 95 S Ct 2051, 44 L Ed 2d 621 (1975), the Supreme Court restated the *Howey* test:

"'* * * the touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entreprenurial or managerial efforts of others.'"

The Oregon Supreme Court adopted a modified *Howey* test in light of *Forman:*

"(1) An investment of money (or money's worth), (2) in a common enterprise, (3) with the expectations of a profit, (4) to be made through the management and control of others." *Pratt v. Kross,* 276 Or 483, 497, 555 P2d 765 (1976).

Profits need not come *solely* from others' efforts.

Under the *Howey-Forman* test, the difficult question here and in most cases about discretionary trading accounts is the existence of a common enterprise or venture. Jurisdictions are split on whether "vertical" or "horizontal" commonality is required.[9] Vertical commonality "requires that the investor and promoter be involved in some common venture without mandating that other investors also be involved in that venture." *Brodt v. Bache & Co., supra,* 595 F2d at 461. Horizontal commonality, a more

---

[9] Two recent federal cases discuss the split of authority and its development. *See Savino v. E. F. Hutton & Co.,* 507 F Supp 1225, 1235-38 (SDNY 1981); *Christensen Hatch Farms, Inc. v. Peavey Co.,* 505 F Supp 903, 905-07 (Minn. 1981).

stringent test, requires pooled investor interests, "usually combined with a pro-rata sharing of profits." *Brodt v. Bache & Co., supra,* 595 F2d at 460. Although the investors here did not expect to share "profits" pro-rata, the evidence supports the finding that the investors' funds were pooled together and with Oxford's funds, at least to the extent that Oxford used investors' funds as its own. Both vertical and horizontal commonality existed.

Moreover, even if we accept petitioner's argument that these accounts were discretionary trading accounts, cases holding such accounts not to be investment contracts are inapposite here.[10] In most of those cases, the trader was not a common venturer but only an agent. The court in *Brodt v. Bache & Co., supra,* upon which petitioner relies, made this distinction:

"* * * Merely furnishing investment counsel to another for a commission, even when done by way of a discretionary commodities account, does not amount to a 'common enterprise.'" 595 F2d at 462.

The court in *Brodt* held no more than that. There the broker's only interest was in commissions, which could be earned regardless of individual investor profit or loss. The investor shared profits neither with other investors nor with the broker, and his fortunes were not directly related to either the broker's general financial health or its ability "to perform a duty, the purpose of which would be 'to secure' to some extent the [investor's] investment." 595 F2d at 462.

Such is not this case. Regardless of the investors' expectations and of Oxford's and its agents' representations, Oxford and its agents were not mere agents or mere conduits between investors and the market. We must apply the *Howey* test in light of "* * * the substance - the economic realities of the transaction - rather than the names that may have been employed by the parties." *United Housing Foundation, Inc., v. Forman, supra,* 421 US at 851-52; *accord, Teamsters v. Daniel,* 439 US 551, 99 S Ct 790, 58 L Ed 2d 808 (1979). The economic realities here are that Oxford did not execute the promised transactions

---

[10] See cases discussed in authorities cited *supra,* n 9.

but confirmed to its investors what were in fact unexecuted, sham transactions; investors in fact "shared" their success and loss with each other and with Oxford when it pooled the funds and used them for its own benefit beyond mere commissions.

### Risk-Capital Test

The Oregon Supreme Court did not limit "investment contracts" only to those satisfying that test, but has expressly provided that new situations may require modification of the rule. This court had applied a "risk-capital" test in *State v. Consumer Business System*, 5 Or App 19, 29, 482 P2d 549 (1971). The Oregon Supreme Court approved that as an alternative test in *Pratt v. Kross, supra*, 276 Or at 490, quoting the Hawaii Supreme Court's definition that an investment contract exists when:

"(1)   an offeree furnishes initial value to an offeror, and

"(2)   a portion of this initial value is subjected to the risks of the enterprise, and

"(3)   the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

"(4)   the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise." *Commissioner v. Hawaii Market Center, Inc.*, 52 Hawaii 642, 485 P2d 105, 109 (1971).

Further, by either the *Howey-Forman* or risk-capital test, the investors here did have a reasonable expectation of profits — favorable tax consequences — to be derived from at least Oxford's managerial, if not its entreprenurial, efforts and control, especially if we accept petitioner's argument that the accounts were discretionary. *See Brodt v. Bache & Co., supra*, 595 F2d at 460, relied upon by petitioner. The transactions described in the Commissioner's final order also meet the other elements of the risk-capital test.

We need not decide here between the risk-capital and *Howey-Forman* tests. Because we find that the transactions meet both tests and were investment contracts, and

therefore securities under ORS 59.015(13), we hold that the Corporation Division had jurisdiction.

Affirmed.