STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES CHARLES NISTLER,
*Defendant-Appellant.*

Jackson County Circuit Court
092042AFE; A147483

342 P3d 1035

Jedediah Peterson, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Matthew J. Lysne, Assistant Attorney-in-Charge, argued the cause for respondent. With him on the brief was Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

HASELTON, C. J.

---

* Haselton, C. J., *vice* Wollheim, S. J.

### HASELTON, C. J.

Defendant, who was convicted of racketeering, eight counts of securities fraud, and eight counts of aggravated first-degree theft, argues that the trial court erred in (1) denying his demurrer to five of the theft charges on statute of limitations grounds, (2) denying his motion for judgment of acquittal on all of the securities fraud charges, and (3) rejecting two distinct challenges to the testimony of a state's witness. As explained below, we conclude that the trial court erred in denying the demurrer as to the five theft charges.[1] However, with respect to the remaining assignments of error, we conclude that the trial court correctly denied defendant's motion for judgment of acquittal on the securities fraud charges, properly determined that the state's witness's testimony was admissible expert testimony under OEC 702, and did not otherwise commit reversible error with respect to the admission of that testimony. Accordingly, we reverse five of the theft convictions and otherwise affirm.

Consistent with the jury's verdict, the facts pertaining generally to defendant's convictions are as follows. In 2004, defendant's wife purchased undeveloped property in Jackson County for $220,000, after which defendant and his wife, along with Kellems, created Jackson County Development, LLC. In March 2006, defendant's wife sold the property to Jackson County Development, LLC, for $800,000, and in exchange received a promissory note for $765,000 secured by a trust deed on the property. The property, called Tennessee Acres, was subdivided into six lots, and the present charges relate to defendant's activities in procuring money from investors for development of houses on lots within Tennessee Acres.

Beginning approximately in early 2006 and through part of 2007, defendant ran an advertisement in a

---

[1] We note that no statute of limitations issue is presented with regard to the racketeering conviction, although the aggravated first-degree theft charges were listed among the predicate offenses. *See generally State v. Jones*, 168 Or App 461, 464, 3 P3d 719 (2000) (noting that statute of limitations for racketeering charge was significantly longer than statute of limitations for underlying predicate offense).

newspaper that stated: "ATTENTION INVESTORS[,] Earn 12-15% return. Secured by land. Call Jim Nistler, First Call Mortgage," and defendant's telephone number. Investors— the victims in this case—responded to the ad or heard of defendant from others, and contacted defendant about investing. Defendant suggested to them that they invest in Tennessee Acres, explaining that houses would be built on the six lots, and that the investors would earn interest and be repaid in full within a specified period of time. Between approximately March 2006 and March 2007, the victims entered into agreements with defendant and received promissory notes from defendant, which were secured by trust deeds to various of the lots within Tennessee Acres. The victims were to receive prepaid interest and a full return of the amount invested after a given period. The victims understood that the money they provided to defendant would be used to build houses on the lots in Tennessee Acres. The victims received some of the prepaid interest they had been promised, and some received partial repayment, but were not repaid in full by defendant as promised.

Although some of the funds defendant received from the victims were used for development of Tennessee Acres, the funds were used in significant part to pay defendant's wife and other investors. The houses on the lots in Tennessee Acres were not completed as expected, and defendant was unable to repay the victims pursuant to the terms of the promissory notes. The victims recouped some, but not all, of their losses during foreclosure sales on the lots in Tennessee Acres.

In May 2009, defendant was indicted on the present charges. As discussed in more detail below—and as pertinent to defendant's assignment of error relating to the denial of his demurrer—the offenses were alleged to have occurred between March 2006 and April 2007. Defendant filed a demurrer, arguing, in pertinent part, that five of the theft charges were not alleged to have been committed within the statute of limitations. The trial court denied the demurrer.

Shortly before trial, in an omnibus hearing addressing various evidentiary issues, jury instructions, and

exhibits, one of the prosecutors mentioned that the state intended to call Carolyn Smith as its first witness, and that she would offer expert testimony as to whether, *inter alia,* the disputed transactions involved securities. Defendant objected that such testimony would be improper, and the trial court ruled that Smith's opinion would be admissible under OEC 702. Thereafter, on the morning of the first day scheduled for trial, defense counsel raised another objection to Smith's testimony—*viz.,* that the state had committed a discovery violation by failing to timely identify Smith as a trial witness. The trial court determined that there had been no discovery violation.

In the ensuing trial, Smith testified, describing the attributes of a "security" under Oregon's securities laws and offering an opinion that the disputed transactions did involve "securities." Defendant subsequently unsuccessfully moved for a judgment of acquittal on all securities fraud charges, contending that the state had failed to prove that the predicate transactions involved "investment contracts" and, hence, "securities." The jury found defendant guilty of racketeering, as well as eight counts each of securities fraud and aggravated first-degree theft.

On appeal, defendant makes four arguments. First, he asserts that the trial court erred in denying his demurrer to five of the theft charges, on the ground that the charges were brought after the three-year statute of limitations ran for those offenses. Second, he asserts that the trial court erred in denying his motion for judgment of acquittal on all of the securities fraud charges, arguing that the investments at issue in the present case did not involve "securities." Third, he asserts that the trial court erred in determining that no discovery violation occurred with respect to the state's witness Carolyn Smith. Finally, he asserts that the trial court should have excluded Smith's testimony under OEC 702. As explained below, we conclude that defendant is correct about the statute of limitations, but that the trial court properly rejected his remaining arguments.

We turn first to the question whether the trial court erred in denying defendant's demurrer, predicated on ORS

135.630,[2] to five of the aggravated first-degree theft charges, on the ground that the charges were not brought within the statute of limitations. Under ORS 131.125(7),[3] a prosecution for first-degree theft must, in most circumstances, be brought within three years of the commission of the offense. ORS 131.125(8)(a) provides that,

"[i]f the offense has as a material element either fraud or the breach of a fiduciary obligation, prosecution may be commenced within one year after discovery of the offense by an aggrieved party or by a person who has a legal duty to represent an aggrieved party and who is not a party to the offense, but in no case shall the period of limitation otherwise applicable be extended by more than three years."

The charges in this case were brought on May 15, 2009. The five challenged aggravated first-degree theft charges alleged dates of commission that were not within three years of May 15, 2009. Those charges read:

"The defendants, James C. Nistler and Michelle M. Nistler, on or about [dates between March 24, 2006 and May 5, 2006], did unlawfully and knowingly commit theft of money, of the total value of $10,000 or more, the property of [named victims]. The state further alleges that the above described offense included a material element of fraud and that prosecution of the offense was commenced within one year after discovery of the offense by an aggrieved party, or a person who has a legal duty to represent an aggrieved

---

[2] ORS 135.630 provides, as pertinent here:

"The defendant may demur to the accusatory instrument when it appears upon the face thereof:

"* * * * *

"(2) If the accusatory instrument is an indictment, that it does not substantially conform to the requirements of ORS 132.510 to 132.560, 135.713, 135.715, 135.717 to 135.737, 135.740 and 135.743."

ORS 132.540(1) provides:

"The indictment is sufficient if it can be understood therefrom that:

"* * * * *

"(c) The crime was committed at some time prior to the finding of the indictment and within the time limited by law for the commencement of an action therefor."

[3] The subsections of this statute were renumbered subsequent to this prosecution, but the pertinent text has not changed. We refer to the subsections by their current numbers.

party and is not a party to the offense, and further, that prosecution was commenced not more than six years after the offense was committed."

In his demurrer to these charges, defendant asserted that the charges were untimely under the three-year statute of limitations. The state responded that the charges were timely under ORS 131.125(8), because each of the theft offenses, as alleged, had fraud as a material element. The state alternatively argued, citing *State v. Knutson*, 81 Or App 353, 725 P2d 407 (1986), that the statute of limitation did not begin to run while the stolen property was "concealed." The trial court denied defendant's demurrer.

On appeal, defendant asserts that aggravated first-degree theft does not have fraud as a material element. Defendant is correct. *State v. Hunter*, 257 Or App 764, 766, 308 P3d 266, *rev den*, 354 Or 490 (2013) (extended statute of limitations period set forth in ORS 131.125(8) does not apply to aggravated first-degree theft because that offense does not contain an element of fraud or breach of a fiduciary obligation); *State v. Ricker*, 107 Or App 245, 246, 810 P2d 1356 (1991) (same). Thus, the sole basis for satisfying the statute of limitations that is pleaded on the face of the indictment is legally inapposite.

The state now acknowledges that ORS 131.125(8) does not apply. Instead, it relies solely on the alternative rationale that it presented in the trial court—that the five charges at issue here involved "concealment," and thus the charges were timely under this court's rationale in the *Knutson* case. The state's alternative reliance on *Knutson* is unavailing in light of *State v. Cervantes*, 232 Or App 567, 575-76, 223 P3d 425 (2009) (discussed below).

*Knutson* arose in an idiosyncratic procedural posture. There, the defendant, who had been charged with first-degree theft with respect to a stolen car, brought a challenge, styled as a "motion to dismiss," arguing that the action had not been commenced in a timely manner. The indictment, on its face, alleged that the crime had been committed well within the applicable three-year statute of limitations—in fact, it alleged that the defendant had committed the theft on June 21, 1985, approximately one month

before the indictment issued in July 1985. 81 Or App at 355-56. Extrinsic to the allegations of the indictment, the parties stipulated before the trial court that the defendant had acquired the car in February 1982, knowing that it had been stolen, and kept it hidden in storage until June 21, 1985, when the police found it in a storage locker. *Id.* at 356. Thus, the allegation in the indictment that the crime had occurred in June 1985 (rendering the indictment within the statute of limitations) was predicated on the state's theory that the defendant's "concealment of the car was a continuing crime," so that the statute of limitations was not triggered until the car was recovered. *Id.* The defendant's "motion to dismiss" was calculated to challenge the state's "continuing crime" theory predicated on circumstances not alleged in the indictment. The trial court rejected the state's theory and granted dismissal. *Id.* at 355.

We reversed and remanded. In doing so, we first noted that the indictment was *not* subject to demurrer, because, assuming the truth of its allegation that the defendant had committed the crime in June 1985, the prosecution had patently been timely commenced. *Id.* Nevertheless, we proceeded, beyond the face of the indictment, to address the merits of the state's "continuing crime" theory—and concluded that "[c]oncealment can be a continuing act and, therefore, the crime of theft by receiving can be a continuing crime." *Id.* at 357 (footnote omitted). Accordingly, we reasoned, because "the state could show that [the] defendant concealed the vehicle from the owner and maintained control over it within three years of the date of the indictment," the trial court had erred in dismissing the indictment. *Id.* Thus, in *Knutson*, we tacitly condoned a procedure by which the parties sought to have the trial court decide a statute of limitations issue that was *not* based on facts alleged in the indictment, but required the court to consider stipulated facts concerning the details of the alleged offense.

In *Cervantes*, an *en banc* decision, we explicitly disavowed that aspect of *Knutson*. 232 Or App at 575-76. There, as in *Knutson*, the defendant brought a "motion to dismiss," alternatively styled as a "demurrer," arguing that the state's theory of the case—how it intended to prove the alleged

crimes—was not tenable. *Id.* at 571-72.[4] The trial court noted that it was being asked to look at facts beyond the face of the indictment, but the parties assured the court that they both had an interest in resolving the issue pretrial. *Id.* at 572. The trial court ruled in the defendant's favor, granting the "demurrer," *id.*, and the state appealed.

On appeal, both parties framed their arguments solely in terms of the substantive correctness—that is, the merits—of the state's putative theory of prosecution, rather than addressing the facial legal sufficiency of the indictment's allegations. *Id.* at 573 ("The parties both continue to make their arguments pertaining to the facts *that they expected the state to prove*, rather than limiting their arguments to the facts as alleged in the indictment." (Emphasis added.)). We rejected that approach as procedurally inapposite. In so holding, we first noted that ORS 135.630, which governs demurrers, specifically limits its reach to certain issues with "the accusatory instrument when it appears on the face thereof," and cited numerous cases for the proposition that a court may not decide a demurrer based on facts not appearing on the face of the indictment. *Id.* at 573-74. In that regard, we specifically rejected the parties' arguments, based on *Knutson*, that "parties may stipulate to have the court consider facts extrinsic to the indictment when deciding a demurrer." *Id.* at 575. We concluded, "[W]e do not consider our unexamined acceptance of the parties' stipulations as to legal issues in [*Knutson*] to permit parties in subsequent cases to stipulate that a court may decide an issue in a manner directly contrary to the provisions of a controlling statute." *Id.* at 576.

The same is true here. We reiterate explicitly what was necessarily implicit in *Cervantes* and *Knutson*: A theory of prosecution dependent on facts not alleged in

---

[4] The defendant in *Cervantes* was charged with, *inter alia*, causing another person to ingest a controlled substance and unlawful application of a controlled substance to a minor. *Id.* at 569. The state's theory of prosecution, predicated on facts not alleged in the indictment, was that the defendant "ingested methamphetamine while the alleged victim *** was a fetus in [the] defendant's womb and that methamphetamine was passed to the fetus via the umbilical cord and continued to be passed in the moments after [the alleged victim] was born but before the umbilical cord was severed." *Id.* at 570.

the indictment is insufficient to defeat a demurrer. Rather (stated in the affirmative), the question that a court must answer when faced with a demurrer concerning the statute of limitations is whether it appears "upon the face of the indictment" that the crime was committed "within the time limited by law for the commencement of" such action. Moreover, any facts "relied on to toll the statute of limitations 'must be set forth in the indictment to survive a demurrer for failure to comply with ORS 132.540(1)(c).'" *State v. Gruhlke*, 257 Or App 485, 493, 306 P3d 773 (2013) (quoting *State v. Bovee*, 76 Or App 572, 576, 710 P2d 786 (1985), *rev den*, 300 Or 605 (1986)).

We have no doubt that the state attempted to satisfy those requirements by including in the indictment the pertinent language from ORS 131.125(8) alleging that the charged offenses involved fraud and that the prosecution was commenced within one year after discovery of the offense. *See* 268 Or App at 475-76 (setting out allegations of indictment). As noted, however, that allegation pertains to a statute that is inapplicable to the crime of aggravated first-degree theft. *See Hunter*, 257 Or App at 766. Nor does the indictment on its face allege *concealment* of the crime of the sort that, at least arguably, would bring it within *Knutson*'s *substantive* scope—*viz.*, that crimes involving concealment of stolen property can be "continuing crimes" for purposes of the statute of limitations. That is, the indictment does not explicitly allege concealment, much less specify the date within the statute of limitations when any "concealment" ended. Thus, on the face of the indictment, the crimes alleged were committed on dates more than three years prior to the bringing of the action. ORS 132.540(1). Accordingly, the trial court erred in denying defendant's demurrer on the five aggravated first-degree theft charges that alleged dates outside of the statute of limitations.

We proceed to defendant's contention that the trial court erred in denying his motion for judgment of acquittal on the securities fraud charges. Defendant asserts that the transactions at issue here did not involve "securities," because they were not "investment contracts," within the meaning of ORS 59.015(19)(a).

ORS chapter 59 concerns the regulation of securities in Oregon. ORS 59.135 provides generally:

> "It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security or the conduct of a securities business or for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:
>
> "* * * * *
>
> "(2) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

ORS 59.015(19)(a), in turn, defines a "security" as follows:

> "'Security' means a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in a pension plan or profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, variable annuity, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such title or lease, real estate paper sold by a broker-dealer, mortgage banker, mortgage broker or a person described in subsection (1)(b) of this section to persons other than persons enumerated in ORS 59.035 (4), or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificates for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."[5]

(Emphasis added.)

Here, each of the securities fraud counts was alleged as involving "a security: to wit: an investment contract," and it was further alleged that defendant made "an untrue statement of a material fact and omitted to state a material fact necessary in order to make the statement made, in the

---

[5] ORS 59.015(19)(b) contains certain exclusions from that definition, none of which is applicable in this case.

light of the circumstances under which the statement was made, not misleading." Defendant argues that the transactions at issue here did not involve "investment contracts" within Oregon's modification of the United States Supreme Court's formulation in *SEC v. Howey Co.*, 328 US 293, 66 S Ct 1100, 90 L Ed 1244 (1946), which was adopted in part and modified by the Oregon Supreme Court in *Pratt v. Kross*, 276 Or 483, 487, 555 P2d 765 (1976).[6] *See also Computer Concepts v. Brandt*, 310 Or 706, 714 n 7, 801 P2d 800 (1990) (noting Oregon's modification of the *Howey* test); *Amerivest Financial, LLC v. Malouf*, 263 Or App 327, 337-42, 328 P3d 739, *rev den*, 356 Or 397 (2014) (applying formulation).

In *Pratt*, the court set forth the test for an "investment contract" as follows:

"[T]he requirements are: (1) an investment of money (or money's worth), (2) *in a common enterprise*, (3) with the expectations of a profit, (4) to be made through the management and control of others."

276 Or at 497 (emphasis added).

Defendant's challenge to the denial of the MJOA is precise: The state failed to prove the "common enterprise" element as adopted in *Pratt* and amplified in *Computer Concepts*. Specifically, defendant contends that the evidence here was legally insufficient to satisfy either the "vertical commonality" or "horizontal commonality" constructs of a "common enterprise." *See Computer Concepts*, 310 Or at 714-15. For the reasons that follow, we conclude that the evidence was sufficient to satisfy the "horizontal commonality" formulation and, consequently, do not address whether it also satisfies the alternative "vertical" formulation.

We begin, briefly, with the baseline precedent, *Pratt*, on which *Computer Concepts* embroidered. In *Pratt*, the central issue was whether the plaintiff's interest in a limited partnership was an "investment contract," where, under the limited partnership agreement, the plaintiff (who made a $15,000 initial investment) was a salaried employee of the partnership and the defendant "was to have full charge of

---

[6] Defendant does not challenge the sufficiency of the state's proof that defendant made untrue statements of material fact or omitted to state material facts.

the management, conduct, and operation of the business." 276 Or at 485. In holding that that arrangement embodied an "investment contract"—and, in turn, constituted a "security" for purposes of the Oregon Securities Law—the Supreme Court concluded that, consistently with the broadly protective statutory purposes and design, a "public offering or solicitation" is not a prerequisite to an "investment contract." Rather, the court held that certain "one-to-one transaction[s] without any public offering or solicitation" can constitute an "investment contract." *Id.* at 483, 495.

*Computer Concepts* involved an option transaction for the financing of a movie. 310 Or at 709-10. The Supreme Court (affirming our court) reversed the allowance of summary judgment for the defendants on a security fraud claim, concluding that there were disputed issues of material fact as to whether that transaction involved the sale of a "security"—and, specifically, an "investment contract." *Id.* at 709. In so holding, the court delineated two alternative constructs of the requisite "common enterprise" for an actionable "investment contract":

> "Federal courts have taken two differing views of what constitutes a common enterprise, 'horizontal' and 'vertical' commonality. Horizontal commonality requires more than one investor and requires a pooling of investments. * * *

> "Vertical commonality has, in turn, been defined in more than one way. Some courts hold that the investor need prove only dependence on promoter expertise. Others require a showing that the investment is interwoven with and dependent on the fortunes of others, so that the investor and the promoter can be said to conduct a common venture. A variation of the latter vertical commonality test requires that the fortunes of the investor and the promoter be intertwined as to both profit *and* loss. * * *

> "This court has not expressly adopted a test for commonality. In *Pratt v. Kross, supra,* however, this court took the view that a one-on-one arrangement could qualify as a security. *Pratt* held that the fraud provisions of the Oregon securities law apply to 'purchasers in isolated transactions where there is no public sale or solicitation,' so long as the transaction otherwise fits the definition of an investment contract. 276 Or at 495. We now hold expressly what *Pratt*

suggested implicitly: that in Oregon a plaintiff may prevail by showing vertical commonality, as an alternative to showing horizontal commonality."

*Id.* at 714-15 (citations and footnotes omitted; emphasis in original). The Supreme Court ultimately concluded that there were material issues of fact as to whether the transaction in *Computer Concepts* satisfied "the most restrictive of the definitions of vertical commonality." *Id.* at 715-16.

The circumstances of the present case manifested a "common enterprise" under the "horizontal commonality" construct. Specifically—and defendant candidly acknowledges as much—the evidence established the requisite participation of "more than one investor" and "pooling of investments." *Id.* at 714.

Defendant maintains, however, that a legally sufficient showing of "horizontal commonality" requires more—specifically, a showing that the investors would be entitled to "a pro-rata sharing of profits." For that proposition, defendant invokes *Black v. Corporate Division*, 54 Or App 432, 634 P2d 1383 (1981).

With respect, *Black* did not so hold. Indeed, in *Black* (a pre-*Computer Concepts* decision), we explicitly concluded that, "[a]lthough the investors * * * did *not* expect to share 'profits' pro rata," "horizontal commonality existed" because "the investors' funds were pooled together." *Id.* at 442 (emphasis added).[7]

In sum, the pooling of investments in the form of proceeds of loans received from a group of investors, whose interests are secured by the same land—land whose value is highly dependent on the borrower's use of the investor's funds to develop that land—satisfied the requisites of "horizontal commonality." We emphasize that this case does not involve a simple, single, and straightforward loan of money by an individual to develop a piece of property, secured by

---

[7] The apparent referent for defendant's contention is a generic, overarching observation that preceded the holding quoted above. *See* 54 Or App at 442 ("Horizontal commonality, a more stringent test, requires pooled investor interests, 'usually combined with a pro-rata sharing of profits.' *Brodt v. Bache & Co.,* [595 F2d 459, 460 (9th Cir 1978)].").

a trust deed on the property. Rather, here: (1) defendant actively solicited "investors" through newspaper advertisements; (2) the investors were told that they, as a group, were invested in the development of Tennessee Acres, which consisted of multiple lots; (3) the investors understood that there were multiple investors, some of which had their loans secured by the same lots within Tennessee Acres; and (4) the investments of the multiple investors were pooled, ostensibly for the purpose of developing the lots in Tennessee Acres. Given those indicia of a "common enterprise," the transactions here were "investment contracts." Accordingly, the trial court properly denied the MJOA.

We turn, finally, to defendant's challenges to the admissions of testimony by the state's witness Carolyn Smith. Defendant first contends that at least some (and perhaps all)[8] of Smith's proffered expert testimony should have been excluded because that testimony was not necessary to "assist the trier of fact to understand the evidence or to determine a fact in issue," OEC 702,[9] but, instead, merely expressed "her opinion as to the application of the law." Defendant further contends that, in all events, Smith's testimony should have been precluded based on alleged discovery violations. As explained below, we reject both challenges.

To provide factual context for defendant's challenges, we briefly recount the substance of Smith's trial testimony. Smith testified that she is an enforcement officer for the Division of Finance and Corporate Securities for the State of Oregon, and her job generally entails investigation of financial matters and participation in administrative

---

[8] Defense counsel initially stated that he "object[ed] to the whole of [Smith's] testimony as an expert opinion on whether or not [defendant] violated the securities law." He subsequently clarified that he did not think that she should be asked "the ultimate question of fact" about whether defendant violated the securities law, but added:

"I think you know, what's a security? What's a loan? What's a warranty deed? What's a trust deed? You know, what are these animals? I think [those are] all appropriate questions."

[9] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

proceedings concerning securities regulations. She is an attorney with 13 years of experience and has investigated over 250 cases involving securities—including, specifically, the transactions at issue in this case. She has attended trainings over the years, including training at the United States Securities and Exchange Commission.[10] Smith discussed the definition of securities under Oregon law, as well as the "common enterprise" concepts described above. She explained that, for purposes of securities regulation, it is immaterial whether parties call something an investment or a loan or a security—that it is the substance of the transaction that matters.

Smith also testified about her investigation into the specific transactions involving Tennessee Acres that are at issue in the present case. She analyzed the promissory notes and trust deeds, as well as reports she had received concerning the investors' expectations. She explained her review of the various transactions at issue in this case and expressed her opinion that those transactions involved investment contracts.

As we understand the record, the gravamen of defendant's OEC 702-related objection before the trial court to Smith's testimony was that that testimony would impermissibly invade the province of the jury, because the determination of whether the transactions at issue here were "investment contracts" was, ultimately, committed to the jury.[11] For example, defense counsel asserted, "This is an ultimate question of fact, for the jury, as to whether or not these were securities beyond a reasonable doubt," and, "if they are securities, that's tantamount to he's guilty," and later objected that Smith's testimony "touched on ultimate opinion."

To the extent that defendant posits, as a *categorical* matter, that Smith's testimony was inadmissible as expressing an opinion on an "ultimate fact," that proposition is irreconcilable with OEC 704, which provides that opinion testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by

---

[10] Defendant does not challenge Smith's qualifications as an expert on securities matters.

[11] Indeed, the jury was so instructed in terms of *Pratt*'s four-part formulation.

the trier of fact." Thus, the inquiry reduces to whether the testimony is "otherwise admissible" under OEC 702, which was the sole basis of defendant's objection before the trial court.[12] Specifically, did Smith have "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue"? OEC 702. The Oregon Legislature, in enacting OEC 702, adopted the commentary from the similarly worded federal rule:

> "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. There is no more certain test for determining when experts may be used than the common sense inquiry whether *the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.*"

Legislative Commentary to OEC 702, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 702.02, 619 (6th ed 2013) (internal quotation marks and citation omitted; emphasis added).

This case is the archetype of the emphasized commentary: The regulation of securities is not within the purview of the average "untrained layman"—nor, for that matter, most legally trained professionals. An overview of what is a security, and how securities are regulated, by someone with "specialized understanding of the subject," provides jurors with valuable context for understanding, and determining—for the ultimate determination is, most assuredly, theirs—whether particular transactions violated criminal laws prohibiting securities fraud. Indeed, it is that highly instructive, contextual grounding that materially distinguishes the circumstances of this case from those, which defendant invokes, holding that "the meaning of a statutory term is a matter of law, not a question of fact for expert testimony." *Hopkins v. SAIF*, 349 Or 348, 355, 245 P3d 90 (2010).

---

[12] Defendant did not, for example, assert that Smith's testimony that the disputed transactions involved "investment contracts" should be excluded under OEC 403. *Compare, e.g., State v. Southard*, 347 Or 127, 139-42, 218 P3d 104 (2009) (proffered evidence of diagnosis of child sexual abuse in the absence of any physical evidence of abuse was not admissible under OEC 403).

*Stokes v. Lundeen,* 168 Or App 430, 7 P3d 586, *rev den,* 331 Or 283 (2000), exemplifies that dispositive distinction. There, the plaintiff and the defendant were involved in an auto collision in a school zone, and the defendant raised a negligence *per se* defense, asserting that the plaintiff could not recover because she had violated a statute that prohibited a person from driving more than 20 miles per hour in a school zone when "children are present." *Id.* at 435-36 (quoting ORS 811.105(2)(c)(A) (1995)). In countering that defense, the plaintiff sought to present testimony from a police officer that he would not have cited the plaintiff for violation of that statute under the circumstances of the case. *Id.* at 433-34. The defendant objected, asserting that "such testimony would invade the court's province to 'instruct the jury about what the law is[,]'" and the trial court sustained that objection. *Id.* On appeal, we affirmed that ruling, concluding that "the meaning of the phrase 'children are present' was a matter of law for the court to determine and to instruct the jury as, indeed, it did." *Id.* at 441.

Whether "children are present" is not a matter of "specialized knowledge" beyond the ordinary experience of most jurors. As is evident from the discussion of circumstantial variance of "common enterprise" above, *see* 268 Or App at 480-84, the same cannot be said of the determination of whether certain transactions involved "securities." Accordingly, the trial court did not err in determining that Smith's testimony would be helpful to the jury in determining that complex matter, pursuant to OEC 702.

Finally, as noted, defendant alternatively contends that Smith's testimony should have been precluded as a sanction for an asserted discovery violation. We review the trial court's determination that there was no discovery violation for errors of law, viewing the predicate facts and reasonably derived inferences in the light most favorable to the trial court's ruling. *See State v. Lindquist,* 141 Or App 84, 88, 917 P2d 510 (1996).

Consistent with that standard of review, the pertinent facts were as follows: Smith (with her affiliation with the Oregon Department of Finance and Corporate Securities specified) was listed on the indictment as a

witness before the grand jury. Thereafter, the state provided all of Smith's reports and memoranda regarding her investigation of the Tennessee Acres matter to defense counsel, as part of its "initial discovery" production. One of the prosecutors averred that he had had "personal conversations" with defense counsel about Smith's report and "her conclusion that the investments sold in this case were securities." At some point, approximately two to three months before trial, one of the prosecutors told defense counsel that the state would be calling an expert witness to testify about securities—but apparently did not, at that point, specify that the expert would be Smith. As set forth below, defense counsel acknowledged that those discussions with the prosecutor had occurred.

As noted above, in the week before trial, the parties engaged in extensive argument in the context of pretrial hearings that touched on the question of what is an "investment contract." That led to a discussion of how the state intended to prove the matter to the jury, and one of the prosecutors remarked that she intended to have Smith provide a background in securities regulation for the jury. Defendant objected to that testimony on the OEC 702-related grounds addressed above but, at that time, did not assert that the defense was prejudicially surprised by Smith's putative testimony or that it should otherwise be precluded as the product of a discovery violation.

On the first scheduled day of the trial, defense counsel raised a new objection to Smith's testimony, stating, "I don't have a witness list from the State. I don't have a report from this witness. I don't know what the lady's name is. I think that's a discovery violation." A colloquy ensued in which prosecutors recounted the circumstances described immediately above. The trial court then asked defense counsel, "did you know this lady was—" to which defense counsel responded:

"I didn't know the lady was going to testify. We, [the prosecutor] and I did have a conversation about experts back and forth. This was probably three months ago, two months ago. So yes he is correct that we did talk about that. I didn't know Carolyn Smith was going to be an expert until Friday when [the prosecutor] announced it."

The trial court ruled that there had been no discovery violation.

We conclude that, even assuming that there was a discovery violation, the record establishes that any error was not reversible error. The record supports a determination that defense counsel knew months before trial that Smith, a securities fraud investigator, had investigated the charged crimes on behalf of the state and had testified before the grand jury, that Smith's reports containing her opinion about securities fraud had been turned over to defense counsel, that a prosecutor and defense counsel had discussed Smith's conclusion that securities fraud had occurred, and that the state intended to adduce expert testimony about the nature of securities fraud. Defendant acknowledges in his brief on appeal: *"In this case, defendant knew of the expert and her reports prior to trial."* (Emphasis added.) He argues, nonetheless, that the state's late disclosure that Smith was the witness who would actually present the expert testimony at trial amounted to a discovery violation.

ORS 135.815(1)(a) requires the state to disclose the names of witnesses it intends to call, as well as their written or recorded statements. This should be done "as soon as practicable following the filing of an indictment." ORS 135.845(1). As noted above, defense counsel ultimately acknowledged that he did know of Smith well before trial, and did not deny the prosecutors' averments that Smith's reports and memoranda had been provided in discovery long before trial and had been discussed with defense counsel.

Even assuming that the state violated ORS 135.815(1)(a), any purported discovery violation would not constitute reversible error on this record. Defense counsel was reasonably alerted to the prospect of Smith's testimony as well as its contents. A continuance—if defendant had sought one instead of insisting on outright preclusion[13]— surely would have been sufficient to allow defense counsel to meet the "surprise" expert testimony in this case; thus, outright preclusion of that testimony would not have been a legally supportable sanction. *Compare State v. Harshman,*

---

[13] Defendant did not request any lesser sanction or other remedy.

61 Or App 711, 716, 658 P2d 1173 (1983) (concluding that discovery violation had occurred and trial court's denial of continuance was erroneous, where "surprise loom[ed] large" when the state, on the morning of trial, first gave notice of intent to offer "other crimes evidence," "den[ying] [defense counsel] the opportunity to meet such evidence").

Convictions on Counts 4, 6, 8, 10, and 12 for aggravated first-degree theft reversed; remanded for resentencing; otherwise affirmed.