678 July 10, 2024 No. 481

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Larry JOHNSON and
Gayle Johnson,
*Plaintiffs-Appellants,*

*v.*

MONSANTO COMPANY,
a corporation,
*Defendant-Respondent,*
*and*

EAGLE POINT HARDWARE, LLC,
a corporation,
*Defendant.*

Jackson County Circuit Court
21CV10291; A179665

Charles G. Kochlacs, Judge.

Argued and submitted May 23, 2024.

Eric D. Pearson argued the cause for appellants. On the briefs was David J. Linthorst.

K. Lee Marshall, California, argued the cause for respondent. Also on the briefs were Dominic M. Campanella and Brophy Schmor LLP, and Alexandra C. Whitworth, California, Sebastian E. Kaplan, California, Olaniyi Q. Solebo, California, and Bryan Cave Leighton Paisner, LLP.

Before Tookey, Presiding Judge, Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Reversed and remanded; motion to take judicial notice denied as moot.

**TOOKEY, P. J.**

Plaintiff sued defendant, Monsanto Company, alleging that his use of a pesticide, Roundup, which is manufactured by defendant, caused him to develop Non-Hodgkin's Lymphoma, which is a type of cancer. A jury returned a verdict for defendant. Plaintiff appeals the resulting judgment.

On appeal, in plaintiff's third assignment of error, he contends that the judgment "should be reversed because of the trial court's error in excluding Charles Benbrook, Ph.D., plaintiff's expert regarding [Environmental Protection Agency (EPA)] regulation." We conclude that the trial court erred in excluding certain testimony of Dr. Benbrook and that that error was not harmless. That conclusion obviates the need to address plaintiff's first, second, and fourth assignments of error.[1]

In a cross-assignment assignment of error, defendant contends that the trial court erred in denying its motion for a directed verdict, in which it argued that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) "expressly and impliedly preempts plaintiff's claims." We conclude that FIFRA does not preempt plaintiff's claims and that, therefore, the trial court did not err in denying defendant's motion for a directed verdict.

In light of those conclusions, we reverse and remand.

---

[1] Plaintiff's first and second assignments of error concern a jury instruction that the trial court gave regarding the EPA's role in regulating pesticides and in pesticide labeling. That instruction is set forth later in this opinion. ___ Or App at ___ (slip op at 6-7).

In plaintiff's first assignment of error, he asserts that the instruction was not "complete or accurate as to [Environmental Protection Agency] requirements under [the Federal Insecticide, Fungicide, and Rodenticide Act] applicable to [defendant's] 'designing or labelling the Roundup' and instead was reasonably capable of confusing or misleading the jury." In plaintiff's second assignment of error, he asserts that the instruction "constituted an improper comment on the weight of the evidence." As noted, however, we need not address those arguments, in light of our conclusion that the trial court erred in excluding Benbrook's testimony and that that error was not harmless. We emphasize, however, that, in declining to reach those assignments, we are not expressing the view that the jury instruction that the trial court gave regarding the EPA's role in regulating pesticides and in pesticide labeling was not erroneous.

Plaintiff's fourth assignment of error asserts that the trial court erred in denying his motion for a new trial. We need not address that argument either, also in light of our conclusions regarding the exclusion of Benbrook's testimony.

# I. BACKGROUND

To provide context for our analysis, we begin with a brief overview of FIFRA, the factual background of this case, and the parties' respective theories of the case—insofar as those theories are relevant to our analysis—and we note the jury instruction regarding the EPA's role in regulating pesticides and pesticide labeling. We provide additional facts relevant to plaintiff's third assignment of error and defendant's cross-assignment of error later in this opinion when considering those assignments of error.

## A. *FIFRA*

"FIFRA creates a comprehensive scheme for the regulation of pesticide labeling and packaging." *Welchert v. Am. Cyanamid, Inc.*, 59 F3d 69, 71 (8th Cir 1995). Specifically, it creates a "complex process of EPA review that culminates in the approval of a label under which a product may be marketed." *Id.*

Under FIFRA, all pesticide manufacturers—including defendant in this case—must "register their pesticides with the [EPA] before they can be sold." *Carson v. Monsanto Co.*, 92 F4th 980, 986 (11th Cir 2024) (citing 7 USC § 136a(a)). A manufacturer seeking to register a pesticide with the EPA "must submit a proposed label, as well as certain supporting data, to the [EPA]." *Id.* (citing 7 USC §§ 136a(c)(1)(C), (F)). The proposed label must address "a number of different topics, including ingredients, directions for use, and adverse effects of the products." *Welchert*, 59 F3d at 71. The EPA registers the pesticide if it determines "that the pesticide is efficacious; that the pesticide will not cause unreasonable adverse effects on humans and the environment; and that the pesticide's label complies with [FIFRA's] prohibition on misbranding." *Carson*, 92 F4th at 987 (internal citation omitted).

Once the EPA "approves a label during the registration process, manufacturers cannot change the label's contents without [the EPA's] prior approval and a new registration application except for minor modifications." *Id.* at 990 (internal quotation marks omitted).

Manufacturers have certain continuing obligations under FIFRA even after the initial registration of a pesticide: Among those obligations, manufacturers must reregister certain pesticides after a certain amount of time has passed—a process that "involves five phases," including data gathering and analysis and "the EPA's independent verification of that data's adequacy." *Id.* at 990. Manufacturers must also "report any adverse effects of the pesticide to the [EPA]" and must "adhere to FIFRA's labeling requirements." *Id.* at 987 (citing 7 USC §§ 136a(f)(1), 136d(a)(2)).

The labeling requirement that is principally at issue in this case is FIFRA's prohibition on "misbranding." FIFRA prohibits pesticide manufacturers selling any pesticide that is "misbranded." *Id.* (citing 7 USC § 136j(a)(1)(E)). "A pesticide is 'misbranded' if its label contains a statement that is 'false or misleading in any particular' or omits adequate instructions for use, necessary warnings, or cautionary statements." *Id.* (citing 7 USC §§ 136(q)(1)(A), (F), (G)).

The EPA's label review and registration of a pesticide, as described above, "does not absolve the registrant's liability if the pesticide is misbranded." *Id.* That is, "the registration process does not establish a safe harbor for pesticide manufacturers." *Id.* Instead, FIFRA provides that "'[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA].'" *Id.* (quoting 7 USC § 136a(f)(2); brackets in *Carson*). But registration does serve as "'prima facie evidence that the pesticide, its labeling and packaging comply with [FIFRA's] registration provisions.'" *Id.* (quoting 7 USC § 136a(f)(2)).

Regarding preemption of state law, FIFRA contains an "express-preemption provision," which provides that a state "'shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under'" FIFRA. *Id.* (quoting 7 USC § 136v(b)). Nevertheless, FIFRA also allows for states to have a role in pesticide regulation, providing that a state "'may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by'" FIFRA. *Id.* (quoting 7 USC § 136v(a)).

B.   *Factual Background and Theories of the Case*

As noted, defendant is the manufacturer Roundup. Roundup contains a pesticide called glyphosate,[2] which, as required under FIFRA, has been registered with the EPA since the 1970s. The label for Roundup approved by the EPA under the provisions of FIFRA does not contain any warning regarding cancer.[3]

Plaintiff used Roundup for decades on his property and later developed Non-Hodgkin's Lymphoma. He came to believe that his Non-Hodgkin's Lymphoma was caused by his use of Roundup, and he brought suit against defendant alleging that defendant was negligent in "both testing and designing Roundup and that defendant knew or should have known that Roundup posed a risk of cancer yet failed to warn or provide adequate instructions for safe use." Plaintiff asserts that defendant spent "more than 40 years *** not properly testing Roundup" to determine whether it was carcinogenic as used. Further, plaintiff asserts that "there was evidence that [defendant] spent decades manipulating and limiting what constituted 'available data' for the EPA and others to consider" when determining if Roundup was safe.

With regard to the EPA's role in approving Roundup's label, among other points, plaintiff argued at trial that the "EPA does not do studies" in connection with registration of pesticides under FIFRA and that at times "the EPA didn't follow their own guidelines" with regard to Roundup.

Defendant disagrees with plaintiff. As defendant sees it, "Roundup is not a cancer risk" and "naturally occurring mutations explain plaintiff's cancer." At trial, during its closing argument, in arguing that Roundup did not cause cancer and that the jury should not hold it liable for plaintiff's cancer, defendant highlighted the EPA's role *vis-à-vis* Roundup's label:

---

[2] Specifically, glyphosate is an herbicide.

[3] Roundup contains other ingredients, too, such as a surfactant. Plaintiff asserts that "there is evidence that surfactants are able to increase glyphosate absorption through the skin"; that is, plaintiff's theory is that Roundup is "more damaging to human DNA than its components considered in isolation." We note that defendant disputes that assertion.

"[Defendant] is not out there making a decision about what goes on its label by itself. The EPA is right there with them. And the EPA has concluded that the label [defendant] has is accurate. They've concluded that the Roundup will not cause any unreasonable risk to humans or to the environment. And that's why the label is the way it is.

"* * * * *

"And Monsanto's working in an environment where the EPA doesn't think that Roundup causes cancer and [defendant] doesn't think so. It wouldn't be able to label the way they do if that weren't the case."

C.   *The Trial Court's FIFRA Instruction*

In this case, at defendant's request, the trial court instructed the jury to consider, during its deliberations, the role that the EPA plays in pesticide registration under FIFRA. Specifically, the trial court instructed the jury:

"The Environmental Protection Agency (referred to as 'EPA') regulates pesticides and pesticide labeling. In order for a pesticide to be sold in the United States, it must be registered by the EPA, who must approve the labeling for the pesticide. Before the EPA may register a pesticide, the EPA must conclude that using the pesticide according to the label requirements will not cause any unreasonable risk to humans or the environment.

"In considering whether [defendant] complied with the standard of care in designing or labeling the Roundup to which [plaintiff] was exposed, you may consider as evidence EPA requirements under [FIFRA].

"As with other evidence, give it the weight, if any, to which you consider it is entitled."

Ultimately, the jury returned a verdict for defendant, and plaintiff appeals the resulting judgment.

II.   PLAINTIFF'S THIRD ASSIGNMENT OF ERROR

As noted, in plaintiff's third assignment of error he contends that the trial court erred in excluding the testimony of "Charles Benbrook, Ph.D., plaintiff's expert regarding EPA regulation." Specifically, we understand that plaintiff wanted to call Benbrook to provide expert testimony regarding "the U.S. pesticide regulatory scheme as well as

the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy."[4]

The trial court ruled that Benbrook's testimony was inadmissible under OEC 702, which provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

Specifically, the trial court ruled that Benbrook was not qualified to provide expert testimony on the topic of the "the U.S. pesticide regulatory scheme" and that Benbrook's testimony would not be "helpful."

As explained below, we conclude that the trial court erred in excluding Benbrook's testimony and that that error was not harmless.

A.  *The Trial Court's Qualification Ruling*

We "review for legal error whether a trial court properly applied OEC 702 in deciding whether an expert is

---

[4] In addition, plaintiff sought to have Benbrook testify as to a variety of other issues, including:

"[1] [Defendant's] testing, information sharing (or lack thereof), and labeling malfeasance * * *.

"[2] The differences between the genotoxicity datasets evaluated by EPA and International Agency [for Research on] Cancer ('IARC'), a branch of the World Health Organization, in their respective evaluations of the carcinogenicity of glyphosate in order to explain why the EPA's current position that glyphosate is not carcinogenic is misplaced and only marginally relevant in cases such as these that arise from exposures to Roundup, as well as why IARC's position that glyphosate-based herbicides (including Roundup) are carcinogenic is well supported by the known science.

"[3] [Defendant's] conduct compared to pesticide industry requirements and standards of care found in the federal statute regulating pesticide use, [FIFRA], the pesticide industry voluntary industry standards, and [defendant's] health and safety pledges to the public."

But we understand the trial court's exclusion of Benbrook's proposed testimony concerning "the U.S. pesticide regulatory scheme as well as the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy" to be what is raised in plaintiff's third assignment of error.

qualified to testify." *Mall v. Horton*, 292 Or App 319, 323, 423 P3d 730, *rev den*, 363 Or 744 (2018). "Whether a witness is qualified to testify as an expert is relative to the topic about which the witness is asked to testify." *State v. Wagner*, 319 Or App 399, 405, 509 P3d 731, *adh'd to as modified on recons*, 321 Or App 79 (2022), *rev den*, 370 Or 714 (2023). "A witness does not need to have a particular education or degree to qualify as an expert." *Id.* "Rather, a witness testifying as an expert needs to have the necessary skill and knowledge to arrive at an intelligent conclusion about the subject matter in dispute." *Id.* (internal quotation marks omitted). Ultimately, OEC 702 sets "forth a liberal standard for qualifying expert witnesses." *Mall*, 292 Or App at 324.

We conclude that the trial court erred when it concluded that Benbrook was not qualified to testify as to the U.S. pesticide regulatory scheme as well as to the interplay between various pesticide regulations.

Benbrook holds a Ph.D. in agricultural economics.[5] During his career, he has served as Staff Director for the US House of Representatives Subcommittee on Department Operations, Research and Foreign Agriculture, "which had authorizing jurisdiction over pesticide regulation pursuant to [FIFRA]." In that role, he was "involved in analyzing compliance with FIFRA, including FIFRA's data requirements and responsibilities of pesticide registrants." Benbrook has published "over 40 peer-reviewed articles, many involving issues related to herbicide use, risk and regulation"— including a paper concerning how "the US EPA and [the International Agency for Research on Cancer] reach[ed] diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides." He has also written numerous "reports, papers, and book chapters on the subject of pesticides and pesticide regulations."

Further, Benbrook has worked as a consultant for federal and state government agencies, as well as private clients, "focusing on biotechnology, pesticide use, risks and regulation, *** and impacts of federal environmental

---

[5] As explained by Benbrook, "agricultural economists are often among the people that get heavily involved in the study of various policy issues, including things like pesticide regulation."

and food laws." He has conducted "multiple pesticide label reviews," and he assisted a company for "four or five years" with "developing [the] registration packages" for two pesticides registered with the EPA. He also assisted that company with their interactions with the EPA.

In addition, Benbrook has served as an expert witness in other litigation on this topic. *See State v. Rogers*, 330 Or 282, 317, 4 P3d 1261 (2000) (in discussing expert's qualifications, considering that the expert had rendered opinions and conclusions in the past, including as part of civil and criminal proceedings); *see, e.g.*, *Pilliod v. Monsanto Co.*, 67 Cal App 5th 591, 607, 645 n 33, 282 Cal Rptr 3d 679, 694, 723 n 33 (2021), *cert den*, ___ US ___, 142 S Ct 2870 (2022) (characterizing Benbrook as "an economist with experience in pesticide use and regulation" and "plaintiff's regulatory expert," and noting that Benbrook "had been staff director of the congressional subcommittee with jurisdiction over FIFRA"); *Johnson v. Monsanto Co.*, 52 Cal App 5th 434, 442, 266 Cal Rptr 3d 111, 119 (2020) (noting that Benbrook testified as an expert "in pesticide regulation and pesticide risk assessment" and "explained the EPA's process to test a new pesticide and the differences between an [International Agency for Research on Cancer] analysis and an EPA risk assessment").

In arguing that Benbrook is not qualified to provide expert testimony on the topic of "the U.S. pesticide regulatory scheme as well as the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy," defendant points out that "Benbrook admitted he had no direct responsibility for regulating pesticides." That is true, but that does not mean that Benbrook is not qualified to testify about pesticide regulation under FIFRA. Though "the expertise necessary to testify helpfully about a complex subject, requires more than general familiarity with the subject," *State v. Brown*, 294 Or App 61, 68, 430 P3d 160 (2018), it is not a prerequisite to have been a regulator at the EPA, or, for example, even a lawyer, to testify about FIFRA, assuming the expert has other, relevant qualifications, *see Rogers*, 330 Or at 315 ("Whether he is the best expert witness on the specific subject or what

credibility will be given to the witness's testimony are matters that go to the weight of his testimony and not to his qualification." (Internal quotation marks omitted.)).

Consequently, we conclude that the trial court erred in concluding that Benbrook was not qualified to testify as to "the U.S. pesticide regulatory scheme as well as the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy."

B.  *The Trial Court's Helpfulness Ruling*

The trial court also determined that Benbrook's testimony would not be "helpful" to the jury. To be helpful, "expert testimony must assist a trier of fact to understand the evidence or determine an issue of fact that it may not be able to understand or determine as well on its own." *State v. Jesse*, 360 Or 584, 594, 385 P3d 1063 (2016).

It is not clear from the record that the trial court's "helpfulness" determination was intended to be separate from its determination that Benbrook was not qualified to testify about the "U.S. pesticide regulatory scheme." One way to understand the trial court's ruling is that the trial court determined that because Benbrook was not qualified, his opinions would not be helpful.

Defendant posits an alternative understanding: that the trial court determined that Benbrook's testimony would not be helpful, because "his opinions would merely interpret FIFRA, intruding on the trial court's domain."[6]

---

[6] In its briefing, defendant also contends that the "trial court found that Dr. Benbrook was unreliable," and that, for that reason, it determined that his testimony would not have been helpful.

We observe that the trial court never used the term "unreliable" in its ruling regarding Benbrook. But, as defendant accurately points out in its brief, in its ruling, the trial court was critical of Benbrook's use of the internet for research and noted that Benbrook "seems to be ready to offer an opinion on any salient issue in the case."

On the former point—Benbrook's use of the internet for research—we understand the evidence that the trial court pointed to regarding Benbrook's use of the internet for research to reflect that Benbrook uses "raw data from the pesticide-use surveys conducted by the National Agricultural Statistics Service" in conducting his own research, and that he obtains that data from the internet. On this record, we perceive nothing in that method that would render Benbrook's testimony unreliable. It bears emphasis that, today, many scientific articles and reliable data are available via the internet.

In view of the parties' theories of the case as described above, we disagree with defendant that testimony explaining a relevant and complex regulatory scheme in a case such as this is an intrusion on the trial court's domain and that Benbrook's testimony would not have been "helpful" to the jury under OEC 702.

Under the federal counterpart to OEC 702, upon which OEC 702 was modeled, s*ee* Legislative Commentary to OEC 702 (1981) (noting that OEC 702 "is identical to Rule 702 of the Federal Rules of Evidence," and "adopt[ing] the commentary of the federal advisory committee"), courts have held that "[e]xperts generally may not testify on pure issues of law, such as the meaning of statutes or regulations," but they have "permitted regulatory experts to testify on complex statutory or regulatory frameworks when that testimony assists the jury in understanding a party's actions within that broader framework." *Antrim Pharm. LLC v. Bio-Pharm, Inc.*, 950 F3d 423, 430-31 (7th Cir 2020) (collecting case); *see also CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F Supp 2d 1229, 1240 (ED Cal 2005) ("Where complex

---

On the latter point—that Benbrook "seems ready to offer an opinion on any salient issue in the case"—the trial court noted that "[i]t almost feels like [Benbrook] is a trial consultant, who now purports to be an expert on all the issues that we are addressing." But we think Benbrook's potential lack of qualification to testify with regard to certain topics on which plaintiff wanted him to opine does not mean that he is not qualified to opine on the U.S. pesticide regulatory scheme. Further, bias for plaintiff, or against defendant, is an appropriate subject of cross-examination, *see State v. Brown*, 299 Or 143, 150, 699 P2d 1122 (1985) ("[B]ias due to friendship, family relationship, etc., and interest in the form of amount of expert witness fees, etc., continue to be viable forms of impeachment[.]"), but does not necessarily render Benbrook's testimony unreliable.

We are thus unpersuaded by defendant's "unreliability" argument

Additionally, we note that, at oral argument, defendant contended that the trial court excluded Benbrook's testimony because it would have been "cumulative" of various other evidence related to EPA regulations. But, specifically, what the trial court ruled was that Benbrook's "proposed testimony on EPA versus IARC would be cumulative." We understand that ruling to have been specific to one of the topics on which plaintiff sought to have Benbrook testify, *viz.*, "the differences between the genotoxicity datasets evaluated by EPA and International Agency [for Research] on Cancer." That is not the topic of Benbrook's proposed testimony that is at issue in this appeal, *i.e.*, "the U.S. pesticide regulatory scheme as well as the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy." Thus, Benbrook's testimony regarding the U.S. pesticide regulatory scheme was not excluded by the trial court on the basis that it was cumulative as defendant contended at oral argument.

administrative processes are at issue, expert testimony can be helpful to explain them to the trier of fact.").

That approach is consistent with how we have interpreted OEC 702. In *State v. Nistler*, 268 Or App 470, 342 P3d 1035, *rev den*, 357 Or 551 (2015), for example, the defendant had been convicted of, among other crimes, racketeering and securities fraud, and asserted that the trial court erred in admitting the testimony of the state's expert witness who testified regarding, among other topics, (1) the "definition of securities under Oregon law"; (2) the meaning of "common enterprise" in determining whether something is an "investment contract," and consequently, a "security," within the meaning of ORS 59.015(19)(a); and (3) that, "for purposes of securities regulation, it is immaterial whether parties call something an investment or a loan or a security—that it is the substance of the transaction that matters." *Id.* at 485. The defendant argued that that expert testimony "should have been excluded because that testimony was not necessary to assist the trier of fact to understand the evidence or to determine a fact in issue, but, instead, merely expressed [the expert's] opinion as to the application of the law." *Id.* at 484 (internal citation omitted).

In rejecting the defendant's argument, we explained that the Oregon Legislature, "in enacting OEC 702, adopted the commentary from the similarly worded federal rule," commentary which provides:

> "'Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. There is no more certain test for determining when experts may be used than the common sense inquiry whether *the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.*'"

*Id.* at 486 (emphasis in *Nistler*). We then reasoned that the trial court did not err in allowing the expert testimony regarding the regulation of securities, explaining:

> "This case is the archetype of the emphasized commentary: The regulation of securities is not within the purview of the average 'untrained layman'—nor, for that matter,

most legally trained professionals. An overview of what is a security, and how securities are regulated, by someone with 'specialized understanding of the subject,' provides jurors with valuable context for understanding, and determining—for the ultimate determination is, most assuredly, theirs—whether particular transactions violated criminal laws prohibiting securities fraud. Indeed, it is \*\*\* highly instructive, contextual grounding \*\*\*."

*Id.* (quoting Legislative Commentary to OEC 702).

In *Nistler*, we also distinguished the expert's testimony, which, as noted, we concluded was admissible, from an expert's testimony in a different case, *Stokes v. Lundeen*, 168 Or App 430, 7 P3d 586, *rev den*, 331 Or 283 (2000), where we concluded that certain expert testimony was not admissible.

In *Stokes*, the defendant sought to introduce expert testimony on "the meaning of the phrase 'children are present'" in ORS 811.105(2)(c)(A) (1995). 168 Or App at 441. We concluded that the trial court did not err in excluding that expert testimony because "the meaning of the phrase 'children are present' was a matter of law for the court to determine and to instruct the jury as, indeed, it did." *Id.*

The difference between the expert testimony in *Stokes*, on the one hand, and *Nistler*, on the other, is that "whether 'children are present' is not a matter of 'specialized knowledge' beyond the ordinary experience of most jurors," but "the same cannot be said of the determination of whether certain transactions involved 'securities.'" *Nistler*, 268 Or App at 487.

In this case, as noted, defendant relied on the EPA's approval of Roundup's label in presenting its defense as to plaintiff's claims, and the trial court instructed the jury that it could consider the requirements of FIFRA in determining whether Monsanto "complied with the standard of care in designing or labeling the Roundup." Like the regulation of securities, the regulation of pesticides under FIFRA is "'not within the purview of the average 'untrained layman'—nor, for that matter, most legally trained professionals.'" *Id.* at 486 (quoting Legislative Commentary to OEC 702). And an overview of how pesticides are regulated by someone with a

specialized understanding of the subject, such as Benbrook, would provide "highly instructive, contextual grounding," *id.*, for the jury, should the jury find such an expert credible.

Moreover, we note that, particularly here, where defendant's liability was not ultimately governed by federal regulations, but by state law theories, including negligence, we do not think it would "intrud[e] on the trial court's domain" to allow an expert to testify regarding FIFRA, because that testimony would assist the jury in determining whether defendant complied with the standard of care in designing or labeling the Roundup to which plaintiff was exposed. *See In re Mirena IUD Products Liab. Litig.*, 169 F Supp 3d 396, 467 (SDNY 2016) ("[T]his case is not governed by federal regulations but by state law theories of negligence and strict liability"; "[e]xpert testimony regarding [defendant's] compliance with FDA regulations therefore will not usurp the Court's role in explaining the law to the jury, but will assist the jury in determining whether [defendant] acted as a reasonably prudent pharmaceutical manufacturer.").

Consequently, we conclude that the trial court erred in excluding as unhelpful Benbrook's testimony on the U.S. pesticide regulatory scheme and on the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy.[7]

## C.   *Harmlessness*

Finally, defendant contends that any error in excluding Benbrook's testimony was harmless. As indicated above, what inferences the jury should or should not draw from the EPA's approval of Roundup's label under FIFRA was an issue

---

[7] Although the parties agree that we review the trial court's determination that Benbrook was not qualified to testify under OEC 702 for errors of law, neither party separately addresses what standard of review we should use to review the trial court's ruling that Benbrook's testimony would not be "helpful" to the jury.

In some circumstances, we review such a ruling for abuse of discretion, but in others we review for errors law. *State v. Garlinghouse*, 323 Or App 640, 654, 524 P3d 103, *rev den*, 371 Or 106 (2023) ("Whether a trial court has correctly determined that evidence offered under OEC 702 is helpful to the trier of fact is in some circumstances reviewed for errors of law and in other circumstances for abuse of discretion."). We need not resolve that issue with respect to the trial court's "helpfulness" ruling in this case, however, because under either standard we would conclude that the trial court erred.

in this litigation, and the EPA's approval was the subject of a jury instruction and also referred to in closing argument. Benbrook's testimony was relevant to that issue and different from other testimony on that point. Consequently, we cannot say that the error in excluding Benbrook's testimony was harmless. *See State v. Johnson*, 225 Or App 545, 555, 202 P3d 225 (2009) ("[O]rdinarily, when scientifically based testimony by an expert witness is erroneously *admitted,* it weighs against a determination that the error was harmless. It stands to reason that the erroneous *exclusion* of scientifically based testimony of an expert witness is to similar effect." (Emphasis in *Johnson*; internal citation omitted.)); *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?"); *see also Mall*, 292 Or App at 328 (reversing and remanding where "we cannot say that there was little likelihood that the exclusion of [the expert's] testimony as an expert in biomechanical engineering and accident reconstruction affected the jury's verdict" where that testimony was "*qualitatively different* from the other evidence presented" (emphasis added)).

## III. DEFENDANT'S CROSS-ASSIGNMENT OF ERROR

As noted, defendant cross-assigns error to the trial court's denial of its motion for a directed verdict in which it contended that plaintiff's claims are preempted by FIFRA. As defendant sees it, plaintiff's claims are preempted by FIFRA's express preemption provision, which provides, as noted above, that a state "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under" FIFRA. 7 USC § 136v(b). Defendant also contends that plaintiff's claims are impliedly preempted by FIFRA.

We review the trial court's denial of defendant's motion for directed verdict for legal error. *Miller v. Columbia County*, 282 Or App 348, 349, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017). Further, we consider federal preemption principles to determine whether Oregon law is preempted by federal law. *Newman v. Marion County Sheriff's Office*, 328 Or App 686, 691, 538 P3d 895 (2023).

The scope of preemption under FIFRA was addressed by the United States Court of Appeals for the Ninth Circuit in *Hardeman v. Monsanto Company*, 997 F3d 941 (2021), *cert den*, ___ US ___, 142 S Ct 2834 (2022). Although we are "not bound by the decisions of the Ninth Circuit—or any other federal circuit—even on questions of federal law," we "often give particular weight to [Ninth Circuit] decisions because Oregon lies in that circuit," and we consider such "cases for their persuasive value." *State v. Breedwell*, 323 Or App 172, 195, 522 P3d 876 (2022), *rev den*, 371 Or 106 (2023) (internal quotation marks omitted).

Ultimately, *Hardeman*, and a recent case from the United States Court of Appeals for the Eleventh Circuit, *Carson v. Monsanto Co.*, 92 F4th 980 (11th Cir 2024), provide a complete answer to defendant's preemption arguments in this case—an answer with which we agree. Accordingly, we describe those cases in some detail before we turn to defendant's preemption arguments. *See Miller v. Pacific Trawlers, Inc.*, 204 Or App 585, 613 n 23, 131 P3d 821 (2006) ("The fact that the Ninth Circuit appears to be in accord with the weight of federal authority, is also a factor for us to consider." (Internal citation omitted.)).

A.   Hardeman v. Monsanto Co.

In *Hardeman*, the United States Court of Appeals for the Ninth Circuit considered whether a plaintiff's California state law failure-to-warn claim based on the labeling of Roundup was preempted either explicitly or impliedly by FIFRA.

Regarding express preemption, the Ninth Circuit explained that, under the Supreme Court's decision in *Bates v. Dow Agrosciences LLC*, 544 US 431, 437, 125 S Ct 1788, 161 L Ed 2d 687 (2005), a two-part test should be employed to determine whether FIFRA's preemption provision—*i.e.* 7 USC § 136v(b)—preempts a state law claim: "First, the state law must be a requirement '*for labeling or packaging.*' Second, the state law must impose a labeling or packaging requirement that is '*in addition to or different from*' those required under FIFRA." *Hardeman*, 997 F3d at 954-55

(quoting 7 USC § 136v(b); emphasis in *Hardeman*; internal citation omitted).

Regarding the first part of the *Bates* test, the Ninth Circuit concluded that that part was satisfied with respect to the plaintiff's failure-to-warn claim, because the plaintiff's complaint "was based on [the defendant's] failure to provide an adequate warning on a label under California law." *Id.* at 955.

But the Ninth Circuit determined that the second part of the *Bates* test was not satisfied. It explained that, in the second part of the *Bates* test, "'a state-law labeling requirement is not pre-empted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions,'" and that state law is "'equivalent to' and 'fully consistent with' FIFRA where both impose 'parallel requirements,' meaning that a violation of the state law is also a violation of FIFRA." *Hardeman*, 997 F3d at 955 (quoting *Bates*, 544 US at 447). That is, "if a violation of California's duty to warn would also be a violation of FIFRA's misbranding provision, then they impose parallel requirements fully consistent with each other," and a California common law failure-to-warn-claim would not be preempted by FIFRA. *Id.* at 955.

The Ninth Circuit then compared the California common law duty-to-warn claim with FIFRA's misbranding provision and concluded that "FIFRA's misbranding requirements parallel those of California's common law duty," and that, therefore, the plaintiff's "failure-to-warn claims effectively enforce FIFRA's requirement against misbranding and are thus not expressly preempted":

> "FIFRA's misbranding provision requires a pesticide label [to] 'contain a warning or caution statement which may be necessary and if complied with * * * is adequate to protect health and the environment.' § 136(q)(1)(G). Similarly, California common law requires a manufacturer to warn either of any health risk that is 'known or knowable' (in strict liability) or those risks 'a reasonably prudent manufacturer would have known and warned about' (in negligence). Thus, FIFRA—which requires a warning 'necessary' and 'adequate to protect health'—is broader than California's requirement under negligence (no warning

needed if unreasonable to do so) and is, at minimum, consistent with California's requirement under strict liability (no warning needed if risk not known or knowable). § 136 (q)(1)(G)."

*Id.* at 955 (footnotes and some internal citation omitted; omission in *Hardeman*).

In so concluding, the Ninth Circuit rejected an argument by the defendant that "because the EPA repeatedly registered Roundup for sale without a cancer warning, a jury's decision that Roundup should include such a warning would effectively impose a requirement 'in addition to or different from' that required by FIFRA." *Id.* at 956. It reasoned, among other points, that because the EPA's approval of a label is not conclusive of FIFRA compliance, but only *prima facie* evidence of FIFRA compliance, a judge or jury could find "that a label violates FIFRA" even though "it was approved by the EPA." *Id.* That is, "because EPA's labeling determinations are not dispositive of FIFRA compliance, they are similarly not conclusive as to which common law requirements are 'in addition to or different from' the requirements imposed by FIFRA." *Id.* at 956 (quoting 7 USC § 136v(b)).

Regarding implied preemption of the plaintiff's California common law failure-to-warn claim based on Roundup's labeling, the Ninth Circuit explained that "a state failure-to-warn claim is impliedly preempted if the relevant federal and state laws 'irreconcilably conflict'"; that is, where it is "impossible for a private party to comply with both state and federal requirements." *Id.* at 959 (some internal quotation marks omitted). To demonstrate such an "irreconcilable conflict" a private party must present "clear evidence" that "(1) the agency was fully informed of the justifications for the warning the plaintiff demands, (2) the agency has informed the manufacturer that it would not approve changing the label to include that warning, and (3) the agency's action carries the force of law." *Id.* (internal quotation marks, omission, and brackets omitted).

The Ninth Circuit concluded that the defendant had failed to meet that burden, in part because the EPA's actions that the defendant pointed to as causing the

purported irreconcilable conflict—*e.g.*, registering Roundup and approving Roundup's label—did not "have the force of law." *Id.* at 958; *see also id.* at 957 ("FIFRA expressly states that EPA's decision to approve a label during the registration process raises only a rebuttable presumption that the pesticide and its label comply with FIFRA. § 136a(f)(2). It would defy logic to say a rebuttable presumption carries the force of law necessary to have preemptive effect, as doing so would deny any ability to rebut the presumption.").

In reaching the conclusion that implied preemption did not preempt the plaintiff's failure-to-warn claim, the Ninth Circuit also rejected an argument by the defendant that it would be "impossible to comply with both FIFRA and California's common law duty to warn," because "under EPA's regulations, [the defendant] could not have unilaterally changed Roundup's label." *Id.* at 958. The Ninth Circuit pointed out that "[o]nce a pesticide is registered, the manufacturer has a continuing obligation to adhere to FIFRA's labeling requirements," and that "[w]hen a label needs to be changed, the manufacturer has the responsibility to change the label by drafting and submitting the label to EPA for approval," which the EPA "'shall' approve if it determines the change will not violate FIFRA." *Id.* at 959. Further, the Ninth Circuit noted that the "EPA permits pesticide manufacturers to make certain changes to labels without prior approval" if the EPA is notified of the change and that the "EPA has repeatedly permitted pesticide manufacturers to use the notification procedure to add notices related to cancer to their products labels." *Id.*

B.  Carson v. Monsanto Co.

More recently, in *Carson*, also relying on *Bates*, the United States Court of Appeals for the Eleventh Circuit concluded that a plaintiff's Georgia common law failure-to-warn claim against the defendant based on Roundup's labeling was not preempted, either expressly or impliedly, for reasons similar to those in *Hardeman*.

Regarding express preemption, the Eleventh Circuit explained that "FIFRA's preemption provision applies to only those state requirements that are 'in addition to or different

from' federal requirements," and—after comparing FIFRA's prohibition on misbranding to what a plaintiff is required to establish to prove a failure-to-warn claim under Georgia common law—concluded that Georgia common law does not impose duties "in addition to or different from" FIFRA's requirements because "Georgia common law is less demanding than the federal requirements." 92 F4th at 986. In so concluding, the Eleventh Circuit noted that, although "Georgia common law does not exactly track FIFRA's requirements," both "FIFRA and Georgia common law require pesticide manufacturers to warn users of potential risks to health and safety." *Id.* at 992; *see id.* (noting that "[i]f anything, Georgia common law about failure-to-warn claims imposes less of a duty on pesticide manufacturers than FIFRA" because "Georgia common law requires manufacturers to warn of nonobvious and foreseeable dangers of which they know or reasonably should know" while "FIFRA imposes a blanket duty on pesticide manufacturers, regardless of knowledge or foreseeability"). The Eleventh Circuit also explained that FIFRA does not preempt state labelling requirements that are "narrower" that those under FIFRA. *Id.* ("After all, as the Supreme Court has reasoned, '[w]hile such a narrower requirement might be 'different from' FIFRA's requirements 'in a literal sense,' that would be 'a strange reason for finding pre-emption of a state rule insofar as it duplicates' FIFRA." (Quoting *Bates*, 544 US at 547; brackets in *Carson*.)).

Further, similar to the Ninth Circuit in *Hardeman*, the Eleventh Circuit rejected an argument by the defendant that the EPA approval process itself carries a preemptive effect. *Id.* at 993. Just as the Ninth Circuit did, it reasoned that the EPA's approval of a label provides only "*prima facia* evidence, not conclusive proof, that a pesticide is not misbranded," *id.* at 994, and misbranding is what FIFRA prohibits.[8]

---

[8] We note that defendant argues that *Hardeman* was wrongly decided, in part because the Ninth Circuit erred in concluding that the "EPA's approvals must have the 'force of law' to expressly preempt state law requirements." In defendant's view, the "'force of law' element applies to implied preemption, not express preemption."

In *Carson v. Monsanto Co.*, 72 F4th 1261, 1267 (11th Cir 2023), the Eleventh Circuit, sitting *en banc*, agreed with that view of express preemption, holding that a "'force-of-law' inquiry is usually irrelevant where Congress has enacted

Regarding implied preemption, the Eleventh Circuit explained that "[i]mplied preemption occurs when it is impossible for a private party to comply with both state and federal requirements" and that the defendant (as the private party in *Carson*) had not established implied preemption because, among other reasons, the EPA's "repeated approvals of a label without a cancer warning do not mean the [EPA] necessarily would have rejected a label with a cancer warning." *Id.* at 997.

### C.  *Defendant's Arguments in this Case*

In arguing in this case that all of plaintiff's claims are expressly and impliedly preempted by FIFRA, defendant raises a host of arguments that were rejected by the Ninth Circuit in *Hardeman* and by the Eleventh Circuit in *Carson*.

#### 1.  *Express Preemption*

Regarding express preemption, defendant's contention is that plaintiff's failure-to-warn claims meet the first part of the *Bates* test for preemption because they seek to impose state law requirements for labeling. *Hardeman*, 997 F3d 954-55. Further, defendant contends that plaintiff's other claims—which are based on defendant's alleged tortious design and testing of Roundup—are "disguised labeling claims that are also preempted."

Regarding the second part of the *Bates* test for preemption, defendant argues that plaintiff's "alleged common law labeling requirement [that his claims seek to impose] is 'in addition to' and 'different from' FIFRA's requirements," because the EPA "does not require any cancer warning on

---

an express preemption provision." Nevertheless, subsequently, in *Carson v. Monsanto Co.*, 92 F4th 980, 993 (11th Cir 2024)—discussed in the text of this opinion—a panel of the Eleventh Circuit determined that "individual [label] approvals are not 'requirements' under FIFRA" that are entitled to a preemptive effect. *See* 7 USCA § 136v(b) (prohibiting states from imposing or continuing "in effect any requirements for labeling or packaging in addition to or different from those *required* under this subchapter" (emphasis added)).

Consequently, even if defendant were correct that the Ninth Circuit erred in its analysis in *Hardeman* because the "force of law element" is a consideration in implied preemption but not express preemption, the Eleventh Circuit's 2024 decision in *Carson* still leads to the conclusion that plaintiff's claims are not preempted by FIFRA.

Roundup" and the "EPA has repeatedly approved Monsanto's labels for Roundup-related products, which do not contain a cancer warning." Therefore, defendant contends, "any state-law requirement to add such a warning would be "'different from' or 'in addition to' FIFRA's requirements and is thus preempted."

Assuming without deciding that the first part of the *Bates* test for preemption is met, we conclude that the second part related to whether the labeling or packaging requirement is "in addition to or different from" those required under FIFRA is not met. As *Hardeman* and *Carson* demonstrate, whether state law imposes requirements that are "in addition to" or "different from" FIFRA requires a comparison of what is required by FIFRA's misbranding prohibition, on the one hand, and what is required by state law, on the other. *Hardeman*, 997 F3d at 955; *Carson*, 92 F4th at 992. That is because "a state-law labeling requirement is not pre-empted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions"—*i.e.*, where a "violation of the state law is also a violation of FIFRA." *Hardeman*, 997 F3d at 955. Defendant has not undertaken that analysis in its brief on appeal, and we will not undertake that analysis where defendant has failed to do so itself. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function" to "make or develop a party's argument when that party has not endeavored to do so itself.").

Instead, in pressing its express preemption argument on appeal, defendant relies on the EPA's approval of the Roundup label and asserts that that approval—which does not include a cancer warning—preempts plaintiff's claims. But, in our view, as the courts in *Hardeman* and *Carson* concluded, the EPA's approval of a label under FIFRA does not preempt state law claims. *Hardeman*, 997 F3d at 956; *Carson*, 92 F4th at 992. It is merely "*prima facie* evidence" of compliance with FIFRA, but it does not conclusively establish that Roundup is not misbranded. *E.g.*, *Carson*, 92 F4th at 993 (EPA's approval provides only "'*prima facia* evidence,'

not conclusive proof, that a pesticide is not misbranded" (quoting 7 USC § 136a(f)(2))).[9]

## 2. *Implied Preemption*

Regarding implied preemption, defendant contends that it would be "impossible" to comply with both state and federal requirements, because the EPA has "made it abundantly clear that it would not approve a warning that glyphosate causes cancer," and the EPA's determinations "that glyphosate does not cause cancer * * * were reached through formal re-registration and registration review procedures" which "carry the force of law." That same argument was rejected in *Carson*. 92 F4th at 997 ("[T]he [EPA's] registration, interim registration review, and re-registration of glyphosate without a cancer warning do not show that a cancer warning would be impossible. Put differently, the [EPA's] repeated approvals of a label without a cancer warning do not mean the [EPA] necessarily would have rejected a label with a cancer warning. Nor does the [EPA's] concurrent classification of glyphosate as not likely to be carcinogenic to humans alter this conclusion.").

We also point out that, in support of its preemption arguments, defendant has filed a request for judicial notice of certain "facts" drawn from documents attached to its request for judicial notice, which plaintiff opposes. Any consideration of the documents attached to defendant's request for judicial notice—including a 2019 letter from the EPA regarding glyphosate, which rejects the inclusion of a

---

[9] We note that, in its reply brief on its cross-assignment of error, defendant argues that *Hardeman* was wrong when it stated that, under FIFRA, a pesticide must contain a "warning 'necessary' and 'adequate to protect health.'" *Hardeman*, 997 F3d at 955. As defendant sees it, under 7 USC § 136(q)(1)(G), the warning must be *either* necessary (*i.e.*, approved by the EPA) *or* adequate to protect health; that is, it need not be both.

We disagree with defendant and consider the Ninth Circuit's analysis in *Hardeman* to be persuasive. *See* 7 USC §136(q)(1)(G) (pesticide is misbranded if the "label does not contain a warning or caution statement which may be necessary *and* if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health" (emphasis added)); *Breedwell*, 323 Or App at 195 (we consider cases from the Ninth Circuit for their "persuasive value"); *see also Carson*, 92 F4th at 991-92 ("So long as the pesticide's label omits a 'necessary' warning 'to protect health and the environment,' the manufacturer is liable under FIFRA." (Quoting 7 USC § 136(q)(1)(G))).

cancer warning under California's Proposition 65—would not alter our conclusion, for the reasons explained in *Carson* and *Hardeman*. *See, e.g.*, *Carson*, 92 F4th at 996 (2019 letter from the EPA concluding that glyphosate is not likely to be carcinogenic to humans and that California's warning of glyphosate's potential carcinogenic effects was "false or misleading" did not lead to conclusion that the plaintiff's state law claims were preempted because, among other reasons, the letter "did not carry the force of law because it neither reflected sufficient formality, nor created a rule of law that must be obeyed" (internal quotation marks omitted)); *Hardeman*, 997 F3d at 957 ("[T]he 2019 letter—stating that EPA believes any pesticide label with a cancer warning due to the presence of glyphosate will be misbranded—did not follow any formal administrative procedure that would give the letter the force of law." (Internal quotation marks omitted.)). To the extent that we were to consider those documents, it would not change our conclusion in this case and, therefore, we deny the motion as moot.

## IV. CONCLUSION

In sum, on plaintiff's appeal, we conclude that the trial court erred when it excluded Benbrook's testimony on "the U.S. pesticide regulatory scheme as well as the interplay between various pesticide regulations, including the EPA's pesticide cancer risk assessment process and policy" and that the error was not harmless. Further, on defendant's cross-assignment of error, we are persuaded that *Hardeman* and *Carson* are well-reasoned, and we conclude that defendant's FIFRA preemption arguments are foreclosed by the preemption analysis in those cases. We further deny defendant's request to take judicial notice as moot. Consequently, we reverse and remand.

Reversed and remanded; motion to take judicial notice denied as moot.